## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELIZABETH MORTON, KEVIN O'BRIEN, and CHRISTOPHER CRAWLEY on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>DTIQ TECHNOLOGIES, INC.,<br><br>                    Defendant. | Case No. 1:25-cv-12271-ADB<br>Honorable Allison D. Burroughs<br><br>**JURY TRIAL DEMANDED** |

## <u>AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs, Kevin O'Brien, Elizabeth Morton and Christopher Crawley ("Plaintiffs"), on behalf of themselves and all others similarly situated, state as follows for their class action complaint against Defendant, DTiQ Technologies, Inc., ("DTiQ" or "Defendant"):

### INTRODUCTION

1.     Between December 31, 2024, and January 12, 2025, DTiQ, a technology company headquartered in Marlborough, Massachusetts, lost control over its computer network and the highly sensitive personal information stored on its computer network in a data breach perpetrated by cybercriminals ("Data Breach"). Upon information and belief, the Data Breach has impacted at least 4,693 current and former employees.[1]

2.     On information and belief, the Data Breach occurred between December 31, 2024, and January 12, 2025. However, Defendant did not become aware of the Breach until January 12, 2025, allowing cybercriminals unfettered access to its systems for over *twelve days*.

---

[1] *See Data Breach Notifications,* MAINE OFFICE OF THE ATT'Y GEN. https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/bc56306e-8811-4880-b65b-9766613bd12d.html (last visited Oct. 22, 2025).

3.     Following an internal investigation, Defendant learned cybercriminals had gained unauthorized access to current and former employees' personally identifiable information ("PII"), including but not limited to names, social security numbers, and financial account information.

4.     On or about July 25, 2025–over six months after the Data Breach first occurred–DTiQ finally began notifying Class Members about the Data Breach ("Sample Breach Notice"). A sample Breach Notice to Vermont residents is attached as Exhibit A.

5.     Plaintiffs, however, did not receive notice from Defendant until after August 6, 2025. The Breach Notices sent to Plaintiff O'Brien (referred to collectively as "Plaintiff Obrien's Breach Notice") are attached as Exhibit B. Plaintiff O'Brien received one notice from Defendant stating that his name and SSN were compromised and another notice stating that his financial account information was compromised.

6.     Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handing and securing the PII of Plaintiffs, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII—rendering it an easy target for cybercriminals.

7.     Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handing and securing the PII of Plaintiffs, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII—rendering it an easy target for cybercriminals.

8.     Defendant's Breach Notice obfuscated the nature of the breach and the threat it posted—refusing to tell its current and former employees how many people were impacted, how

the breach happened, or why it took the Defendant over six months to finally begin notifying victims that cybercriminals had gained access to their highly private information.

9.      Defendant's failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

10.     Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse. 10. In failing to adequately protect its current and former employees' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendant violated state law and harmed an unknown number of its current and former employees.

11.     Plaintiffs and the Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendant with their PII. But Defendant betrayed that trust. Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

12.     Plaintiffs are former employees of Defendant and Data Breach victims.

13.     The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiffs and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

14.     Plaintiff, Kevin O'Brien, is a natural person and citizen of Massachusetts, where he intends to remain.

15.     Plaintiff, Elizabeth Morton, is a natural person and citizen of Pennsylvania where she intends to remain.

16.     Plaintiff, Christopher Crawley, is a natural person and citizen of Illinois, where he intends to remain.

17.     Defendant, DTiQ, is incorporated in California, with its headquarters and principal place of business at 11 Apex Drive, Suite 300A #108, Marlborough, MA 01752.

## JURISDICTION & VENUE

18.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are over 100 putative Class Members, and two Plaintiffs and Defendant are citizens of different states.

19.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in Massachusetts and regularly conducts business in Massachusetts.

20.     Venue is proper in this Court under because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### DTiQ

21.     DTiQ is a private company headquartered in Marlborough, Massachusetts that offers video surveillance and loss prevention technology for quick-service restaurants, convenience stores, and retailers.[2] DTiQ has additional locations in Nevada, Poland, and Australia, and employs over 500 individuals.[3]

22.     On information and belief, DTiQ accumulates highly private PII of its current and former employees.

---

[2] *Our Story,* DTiQ, https://www.dtiq.com/our-story (last visited Oct. 22, 2025).
[3] *Id.*

23.     In collecting and maintaining its employees' PII, Defendant agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

24.     DTiQ understood the need to protect its current and former employees' PII and prioritize its data security.

25.     Indeed, DTiQ states in its Privacy Policy[4] that:

a.      "[t]he protection of your personal data is important to us;"

b.      "'personal data'" means any information reasonably relating to an identified or identifiable natural person;"

c.      "your personal data will not be disclosed to third parties;" and,

d.      "DTiQ is committed to safeguarding your information to the best of its ability."[5]

26.     Despite recognizing its duty to do so, on information and belief, DTiQ has not implemented reasonably cybersecurity safeguards or policies to protect employees' PII or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, DTiQ leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to employees' PII.

### *DTiQ Fails to Safeguard Employees' PII*

27.     Plaintiffs are former employees of DTiQ.

28.     As a condition of employment with DTiQ, Plaintiffs provided Defendant with their PII, including but not limited to their names, social security numbers, and financial account

---

[4] *Privacy Policy*, DTIQ, https://www.dtiq.com/privacy-policy (last visited Oct. 22, 2025).
[5] *Id.*

information. Defendant used that PII to facilitate its employment of Plaintiffs and required Plaintiffs to provide that PII.

29.     On information and belief, DTiQ collects and maintains employees' unencrypted PII in its computer systems.

30.     In collecting and maintaining PII, Defendant implicitly agreed that it will safeguard the data using reasonable means according to state and federal law.

31.     According to Defendant's Breach Notice, Defendant admits that "[o]n January 12, 2025, [DTiQ] identified unusual activity in our network and immediately began an investigation."[6]

32.     Defendant's investigation revealed that "there was unauthorized access to a portion of [DTiQ's] network between December 31, 2024 and January 12, 2025."[7] Thus, cybercriminals had unfettered access to employees' most sensitive information for at least twelve days before detection.[8]

33.     In other words, the Data Breach investigation revealed Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to break into its network and steal files containing a treasure trove of thousands of its current and former employees' highly private information.

34.     Through its inadequate security practices, Defendant exposed Plaintiffs' and the Class's PII for theft and sale on the dark web.

35.     On or about July 25, 2025– more than six months after the Data Breach occurred– DTiQ finally began notifying some Class Members about the Data Breach.

---

[6] Ex. A.
[7] *Id*.
[8] *Id*.

36.     Plaintiffs, however, did not receive notice from Defendant until on or about August 6, 2025.[9]

37.     Despite its duties to safeguard PII, Defendant did not in fact follow industry standard practices in securing employees' PII, as evidenced by the Data Breach.

38.     In response to the Data Breach, DTiQ contends that it "changed network passwords, and reviewed our policies and procedures."[10] Defendant not only fails to expand on what this "review" entailed but also fails to identify what actual steps or actions, if any, have been taken as a result of the Data Breach. Further, such steps or actions and any additional security enhancements made because of its review should have been in place before the Data Breach.

39.     Further, Defendant recognized the actual imminent harm and injury that flowed from the Data Breach, encouraging breach victims to "remain vigilant against incidents of identity theft and fraud by reviewing your credit reports/account statements for suspicious activity and to detect errors."[11]

40.     Defendant also recognized its duty to implement reasonable cybersecurity safeguards or policies to protect employees' PII, insisting that, despite the Data Breach demonstrating otherwise, "the privacy and security of [employees] information is important to [DTiQ]."[12]

41.     On information and belief, DTiQ has offered several months of complimentary credit monitoring services to victims, which does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves PII that cannot be changed, such as social security numbers and certain financial account information. Further, due

---

[9] See Ex. B.
[10] Ex. A.
[11] Id.
[12] Id.

to Defendant's failure to provide adequate notice, some victims, upon information and belief, are unable to access the credit monitoring offered by Defendant.

42.　　Even with several months of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiffs' and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

43.　　Defendant reported to the Maine Attorney General that the Data Breach was the result of "External system breach (hacking)."[13] This, as well as Defendant's statement that "there was unauthorized access to a portion of our network"[14] indicate that Defendant experienced a ransomware attack.

44.　　According to the United States Cybersecurity and Infrastructure Security Agency ("CISA"), ransomware is a form of malware designed to encrypt files on a device, rendering any files and the systems that rely on them unusable.[15] Thereafter, the cybercriminals demand a ransom payment in exchange for decryption, often threatening to sell or leak exfiltrated data if the ransom is not paid.[16]

45.　　Defendant has made no public statements regarding whether it experienced a ransomware attack or whether it made a ransom payment.

46.　　However, even if Defendant made a ransom payment, there is no guarantee that the PII stolen in the Data Breach will be deleted.[17]  The stolen PII is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[18]

---

[13] *See* n. 1.
[14] Ex. A
[15] *Ransomware 101*, CISA, https://www.cisa.gov/stopransomware/ransomware-101 (last visited Aug. 22, 2025).
[16] *Id*.
[17] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.
[18] *Id*.

47.    Thus, on information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by cybercriminals on the dark web.

48.    And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[19]

49.    Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendant caused widespread injury and monetary damages.

***The Data Breach was a Foreseeable Risk of Which Defendant was on Notice***

50.    It is well known that PII, including names, social security numbers, and financial account information numbers, is an invaluable commodity and a frequent target of hackers.

51.    In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year.[20] The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[21]

52.    In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, *inter alia*, warned the public that "Ransomware attacks are becoming more targeted, sophisticated, and

---

[19] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.
[20] *2024 Data Breach Report* at 6, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[21] *Id.*

costly" and "the losses from ransomware attacks have increased significantly."[22] The FBI further advised "[t]he time to invest in backups and other cyber defenses is before an attacker strikes, not afterward when it may be too late."[23]

53.     In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies.[24] They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[25]

54.     In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[26]

55.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[27]

---

[22] *High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations*, FBI (Oct. 2, 2019), https://www.ic3.gov/PSA/2019/psa191002.
[23] *Id.*
[24] Catalin Cimpanu, *Ransomware mentioned in 1,000+ SEC filings over the past year*, ZDNET (Apr. 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.
[25] *Id.*
[26] *#StopRansomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Oct. 22, 2025).
[27] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

56.     This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

57.     In light of the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted PII of thousands of its current and former employees in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII and Defendant's type of business had cause to be particularly on guard against such an attack.

58.     Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

59.     Prior to the Data Breach, Defendant knew or should have known that it should have encrypted its employees' names, social security numbers, financial account information, and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Plaintiff O'Brien's Experiences and Injuries***

60.     Plaintiff O'Brien is a former employee of Defendant, having worked for Defendant from on or about 1999 to 2021.

61.     Plaintiff O'Brien received Defendant's Breach Notice.

62.     As a condition of employment, DTiQ required Plaintiff O'Brien to provide his PII, including at least his name, Social Security number, and financial account information.

63.     Plaintiff O'Brien provided his PII to DTiQ and trusted that the company would use reasonable measures to protect it according to state and federal law.

64.     Defendant deprived Plaintiff O'Brien of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about the Breach for six months.

65.     As a result of its inadequate cybersecurity, Defendant exposed Plaintiff O'Brien's PII for theft by cybercriminals and sale on the dark web.

66.     Plaintiff O'Brien does not recall ever learning that his PII was compromised in another data breach incident, other than the Data Breach at issue here.

67.     Plaintiff O'Brien suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

68.     As a result of the Data Breach, Plaintiff O'Brien has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit information.

69.     Plaintiff O'Brien has already spent and will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft.

70.     Additionally, following the Data Breach, Plaintiff O'Brien began experiencing a substantial increase in spam and scam phone calls and text messages, suggesting that his PII has been placed in the hands of cybercriminals

71.     Once an individual's PII is for sale and access on the dark web, as Plaintiff's

O'Brien's PII is here as a result of the Data Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information. On information and belief, the spam calls and texts Plaintiff O'Brien is experiencing are a result of the Data Breach.

72.     Plaintiff O'Brien fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff O'Brien has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff O'Brien is experiencing anxiety, distress, and fear regarding how this Data Breach, including the exposure and loss of his Social Security number, will impact his ability to do so. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

73.     Plaintiff O'Brien is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff O'Brien about the Data Breach in a timely fashion.

74.     Plaintiff O'Brien has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Morton's Experience and Injuries***

75.     Plaintiff Morton is a former employee of Defendant, having worked for Defendant from 2003 to 2024.

76.     Plaintiff Morton received Defendant's Breach Notice.

77.     As a condition of employment, DTiQ required Plaintiff Morton n to provide her PII, including at least her name, social security number, and financial account information.

78.    Plaintiff Morton provided her PII to DTiQ and trusted that the company would use reasonable measures to protect it according to state and federal law.

79.    Defendant deprived Plaintiff Morton of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her about the Breach for six months.

80.    As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Morton's PII for theft by cybercriminals and sale on the dark web.

81.    Plaintiff Morton does not recall ever learning that her PII was compromised in another data breach incident, other than the Data Breach at issue here.

82.    In the aftermath of the Data Breach, on or around May 2025 Plaintiff Morton experienced fraud attempts involving her Southwest Visa Credit Card. Unknown individuals attempted to make several charges to her credit card and made several attempts to set up $39 monthly payments.

83.    On information and belief, Plaintiff Morton's non-public PII, such as her date of birth, Social Security number, and financial information, was required to perpetuate the fraud attempts described above. Plaintiff Morton is unaware of how fraudsters could have obtained such information other than via the Data Breach.

84.    Plaintiff Morton suffered additional actual injury from the exposure of her PII—which violates her rights to privacy.

85.    Plaintiff Morton suffered further actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

86.    As a result of the Data Breach, Plaintiff Morton has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data

Breach, reviewing credit card and financial account statements, and monitoring his credit information.

87.    Plaintiff Morton has already spent and will continue to spend considerable time and effort monitoring her accounts to protect herself from identity theft.

88.    Additionally, following the Data Breach, Plaintiff Morton began experiencing a substantial increase in spam and scam phone calls and text messages, suggesting that her PII has been placed in the hands of cybercriminals.

89.    Once an individual's PII is for sale and access on the dark web, as Plaintiff's Morton's PII is here as a result of the Data Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information. On information and belief, the spam calls and texts Plaintiff Morton is experiencing are a result of the Data Breach.

90.    Plaintiff Morton fears for her personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff Morton has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff Morton is experiencing anxiety, distress, and fear regarding how this Data Breach, including the exposure and loss of her Social Security number, will impact her ability to do so. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

91.    Plaintiff Morton is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff about the Data Breach in a timely fashion.

92.     Plaintiff Morton has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Crawley's Experiences and Injuries***

93.     Plaintiff Christopher Crawley is a former employee of Defendant, having worked for Defendant from 2018 to 2020.

94.     As a condition of employment, DTiQ required Plaintiff Crawley to provide his PII, including at least his name, date of birth, driver's license number, Social Security number, and financial account information

95.     Plaintiff Crawley provided his PII to DTiQ and trusted that the company would use reasonable measures to protect it according to state and federal law.

96.     Defendant deprived Plaintiff Crawley of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about the Breach for six months.

97.     As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Crawley's PII for theft by cybercriminals and sale on the dark web.

98.     Plaintiff Crawley does not recall ever learning that his PII was compromised in another data breach incident, other than the Data Breach at issue here.

99.     In the aftermath of the Data Breach, Plaintiff Crawley has experienced identity theft and fraud. First, unknown individuals attempted to make unauthorized charges to Plaintiff Crawley's financial accounts and sign-in to the accounts. Plaintiff Crawley was made aware of these fraud attempts when he received notifications from his financial institution.

100.    Additionally, in early October 2025, unknown individuals used Plaintiff Crawley's PII to apply for eleven (11) personal loans in his name. Plaintiff Crawley was notified of the loan

applications when he began to receive notifications from LifeLock, an identity theft protection service he uses, and emails from lenders acknowledging receipt of the loan applications.

101.    Plaintiff Crawley estimates that he has spent over sixty (60) hours reporting the fraud to the lenders described above and to the credit buraus, freezing his credit, disputing the loan applications and attempting to remove the applications from his credit files. This process is ongoing, as not all of the pulls to Plaintiff Crawley's credit have been removed from his reports.

102.    Plaintiff Crawley spent money mailing letters to the credit buraus in order to freeze his credit and to report the fraud.

103.    On information and belief, Plaintiff Crawley's non-public PII, such as his date of birth, Social Security number, and financial information, was required to apply for loans in his name. Plaintiff Crawley is unaware of how fraudsters could have obtained such information other than via the Data Breach.

104.    Furthermore, following the Data Breach, Plaintiff Crawley began receiving calls from individuals attempting to collect money from him and emails notifying him of subscriptions that he did not sign up for. This suggests that Plaintiff Crawley's PII has been placed in the hands of cybercriminals.

105.    Once an individual's PII is for sale and access on the dark web, as Plaintiff's Crawley's PII is here as a result of the Data Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information. On information and belief, the calls and emails Plaintiff Crawley is experiencing are a result of the Data Breach.

106.    Plaintiff Crawley suffered actual injury from the exposure of his PII—which violates his rights to privacy.

107.    Plaintiff Crawley suffered additional actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

108.    Plaintiff Crawley has already spent and will continue to spend considerable time and effort monitoring his accounts, reviewing his credit card and financial account statements, and monitoring his credit information to protect himself from identity theft.

109.    Plaintiff Crawley fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff Crawley has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff Crawley is experiencing anxiety, distress, and fear regarding how this Data Breach, including the exposure and loss of his Social Security number, will impact his ability to do so. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

110.    Plaintiff Crawley is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Crawley about the Data Breach in a timely fashion.

111.    Plaintiff Crawley has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

112.    Plaintiffs and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

113.    As a result of DTiQ's failure to prevent the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiffs and the class have suffered or are at an increased risk of suffering:loss of the opportunity to control how their PII is used;

    a.    The loss of the opportunity to control how their PII is used;

    b.    diminution in value of their PII;

    c.    compromise and continuing publication of their PII;

    d.    out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

    e.    lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

    f.    delay in receipt of tax refund monies;

    g.    unauthorized use of their stolen PII; and

    h.    continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

114.    Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

115.    The value of Plaintiff and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "dark web"—further exposing the information.

116.    Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

117.    It can take victims years to spot identity or PII theft, giving criminals plenty of time to use that information for cash.

118.    One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data— first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

119.    The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and members of the Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

120.    Defendant disclosed the PII of Plaintiff and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII

of Plaintiff and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

121.    Defendant's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Consumers Prioritize Data Security***

122.    In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[28] Therein, Cisco reported the following:

   a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[29]

   b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[30]

   c.    89% of consumers stated that "I care about data privacy."[31]

---

[28] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, Cisco, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Oct. 22, 2025).
[29] *Id*. at 3.
[30] *Id*.
[31] *Id*. at 9.

d.    83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[32]

e.    51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[33]

f.    75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[34]

123.    Defendant knew or should have known that adequate implementation of cybersecurity and protection of PII, including Plaintiffs' and the Class's PII, was important to its members.

### *Defendant Failed to Follow FTC Guidelines*

124.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

125.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[35]  The FTC declared that, *inter alia*, businesses must:

a.    protect the personal customer information that they keep;

b.    properly dispose of personal information that is no longer needed;

c.    encrypt information stored on computer networks;

---

[32] *Id.*
[33] *Id.*
[34] *Id.* at 11.
[35] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

    d.      understand their network's vulnerabilities; and

    e.      implement policies to correct security problems.

126.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

127.    Furthermore, the FTC explains that companies must:

    a.      not maintain information longer than is needed to authorize a transaction;

    b.      limit access to sensitive data;

    c.      require complex passwords to be used on networks;

    d.      use industry-tested methods for security;

    e.      monitor for suspicious activity on the network; and

    f.      verify that third-party service providers use reasonable security measures.

128.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

129.    In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former members' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

130.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all

employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

131.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

132.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

133.    These foregoing frameworks are existing and applicable industry standards for an employer's obligations to provide adequate data security for its members. Upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## CLASS ACTION ALLEGATIONS

187.    Plaintiffs bring this action pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

188.    Plaintiffs sue on behalf of themselves and the proposed Class ("Class"), defined as follows:

**All individuals residing in the United States whose PII was compromised in Defendant DTiQ's Data Breach, discovered on January 12, 2025, including all those who received notice of the breach.**

189.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

190.    Plaintiff reserves the right to amend the class definition.

191.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

192.    **Numerosity**. Plaintiffs' claims are representative of the proposed Class, consisting of at least 4,693 individuals, far too many to join in a single action;

193.    **Ascertainability**. Class members are readily identifiable from information in Defendant's possession, custody, and control;

194.    **Typicality.** Plaintiffs' claims are typical of Class member's claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

195.    **Adequacy.** Plaintiffs will fairly and adequately protect the proposed Class's interests. Their interests do not conflict with Class members' interests, and Plaintiffs have retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

196.    **Commonality.** Plaintiff's and the Class's claims raise predominantly common fact and legal questions that a class wide proceeding can answer for all Class members. Indeed, it will be necessary to answer the following questions:

a.  Whether Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.  Whether Defendant was negligent in maintaining, protecting, and securing PII;

d.  Whether Defendant breached contract promises to safeguard Plaintiff and the Class's PII;

e.  Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f.  Whether Defendant's Breach Notice was reasonable;

g.  Whether the Data Breach caused Plaintiff's and the Class's injuries;

h.  What the proper damages measure is; and

i.  Whether Plaintiff and the Class are entitled to damages, treble damages, or injunctive relief.

197.  **Appropriateness**. The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case. Plaintiffs are not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

198.  Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

**FIRST CLAIM FOR RELIEF**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

199.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

200.    Plaintiffs and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

201.    Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

202.    In fact, as a result of the Data Breach, Plaintiff Morton has already suffered from several fraudulent attempts by an unknown third party (or parties) to make unauthorized payments, all of which occurred around roughly three months ago involving her Southwest Visa Credit Card. Additionally, both Plaintiffs have suffered from an increase in spam calls and text messages.

203.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

204.    Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices.

205.    After all, Defendant actively sought and obtained Plaintiffs' and Class Members' PII.

206.    Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

a.    exercise reasonable care in handling and using the PII in its care and custody;

b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c.    promptly detect attempts at unauthorized access; and

d.    notify Plaintiff and Class members within a reasonable timeframe of any breach to the security of their PII.

207.    Also, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

208.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

209.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

210.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential PII, a necessary part of employment from Defendant.

The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII —whether by malware or otherwise.

211.    PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs' and Class Members' and the importance of exercising reasonable care in handling it.

212.    Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

213.    Defendant breached these duties as evidenced by the Data Breach.

214.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

  a.    disclosing and providing access to this information to third parties and

  b.    failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

215.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs' and Class Members' injury.

216.    Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and Class Members' injuries-in-fact.

217.    Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

218.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

219.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, the use of their PII to attempt fraudulent transactions (Plaintiff Morton) and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CLAIM FOR RELIEF
### Negligence *Per Se*
### (On Behalf of Plaintiffs and the Class)

220.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

221.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

222.    Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

223.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of

224.    Defendant's duty to protect Plaintiffs' and the Class Members' sensitive PII.

225.    Defendant breached its respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

226.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

227.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

228.    But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class Members would not have been injured.

229.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known

that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

230.    Defendant's violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

231.    As a direct and proximate result of Defendant's negligence per se, Plaintiffs and

232.    Class Members have suffered and will continue to suffer numerous injuries (as detailed supra).

### THIRD CLAIM FOR RELIEF
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

187.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

188.    Defendant offered to employ Plaintiffs and members of the Class if, as a condition of that employment, Plaintiffs and members of the Class provided Defendant with their PII.

189.    In turn, Defendant agreed it would not disclose the PII it collects to unauthorized persons. Defendant also promised to safeguard employees' PII.

190.    Plaintiffs and the members of the Class accepted Defendant's offer by providing PII to Defendant in exchange for employment with Defendant.

191.    Implicit in the parties' agreement was that Defendant would provide Plaintiffs and members of the Class with prompt and adequate notice of all unauthorized access and/or theft of their PII.

192.    Plaintiffs and the members of the Class would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

193.    Defendant materially breached the contracts it had entered with Plaintiffs and members of the Class by failing to safeguard such information and failing to notify them promptly

of the intrusion into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiffs and members of the Class by:

    a.    Failing to properly safeguard and protect Plaintiffs' and members of the Class's PII;

    b.    Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

    c.    Failing to ensure the confidentiality and integrity of electronic PII that Defendant created, received, maintained, and transmitted.

194. The damages sustained by Plaintiffs and members of the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

195. Plaintiffs and members of the Class have performed under the relevant agreements, or such performance was waived by the conduct of Defendant.

196. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

197. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

198.    Defendant failed to advise Plaintiffs and members of the Class of the Data Breach promptly and sufficiently.

199.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

200.    Plaintiffs and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

201.    Plaintiffs, on behalf of themselves and the Class, seek compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

### FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

202.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

203.    This claim is plead in the alternative to the breach of implied contractual duty claim.

204.    Plaintiffs and members of the Class conferred a benefit upon Defendant in the form of services through employment. Defendant also benefited from the receipt of Plaintiffs' and the Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiffs and members of the Class.

205.    Under principals of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and the proposed Class's services and their PII because Defendant failed to adequately protect their PII. Plaintiffs and the proposed Class would not have provided their PII or worked for Defendant at the payrates they did had they known Defendant would not adequately protect their PII.

206.     Defendant should be compelled to disgorge into a common fund to benefit Plaintiffs and members of the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged here.

### FIFTH CLAIM FOR RELIEF
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

207.     Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

208.     Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

209.     Defendant owed a duty to its current and former employees, including Plaintiffs and the Class, to keep this information confidential.

210.     The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' PII is highly offensive to a reasonable person.

211.     The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant as part of their employment, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

212.     The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

213.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

214.    Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

215.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

216.    As a proximate result of Defendant's acts and omissions, the PII of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

217.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class because their PII are still maintained by Defendant with its inadequate cybersecurity system and policies.

218.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiffs and the Class.

219.    In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other members of the Class, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**PRAYER FOR RELIEF**

Plaintiffs and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A.  Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B.  Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class;

C.  Awarding injunctive relief as is necessary to protect the interests of Plaintiffs and the Class;

D.  Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen PII;

E.  Awarding Plaintiffs and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.  Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

G.  Awarding attorneys' fees and costs, as allowed by law;

H.  Awarding prejudgment and post-judgment interest, as provided by law;

I.  Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.  Granting such other or further relief as may be appropriate under the circumstances.

### JURY DEMAND

Plaintiffs hereby demand that this matter be tried before a jury.

Date: October 23, 2025     Respectfully Submitted,


        */s/ Anthony I. Paronich*
        Anthony I. Paronich
        Paronich Law, P.C.
        350 Lincoln Street, Suite 2400
        Hingham, MA 02043
        Tel: (617) 485-0018
        anthony@paronichlaw.com

        Raina C. Borrelli*
        raina@straussborrelli.com
        **STRAUSS BORRELLI PLLC**
        One Magnificent Mile
        980 N. Michigan Avenue, Suite 1610
        Chicago, Illinois 60611
        (872) 263-1100
        (872) 263-1109 (facsimile)

        *Pro Hac Vice Forthcoming*

        *Attorneys for Plaintiff and Proposed Class*