## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**ELIZABETH MORTON, KEVIN O'BRIEN, and CHRISTOPHER CRAWLEY**, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**DTIQ TECHNOLOGIES, INC.,**

Defendant.

Case No. 1:25-cv-12271-ADB

Honorable Allison D. Burroughs

## PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANT'S MOTION TO DISMISS

## INTRODUCTION

In July 2025, Plaintiffs received letters that worried them. Their employer, DTiQ, warned they were at risk of "identity theft" and "fraud" because it lost control of their "personally identifiable information" ("PII") (the "Data Breach"). The PII included "highly sensitive" data – their names, Social Security numbers, and "financial account information." DTiQ, as Plaintiffs' employer, had a duty to implement reasonable data security policies, such as multi-factor authentication. Because DTiQ never implemented such policies, for 13 days, between December 2024 and January 2025, criminals infiltrated its network and stole its employees' PII. The Data Breach not only invaded Plaintiffs' privacy, it exposed them to a lifelong risk of identity theft and fraud.

DTiQ recognized the threat its breach posed, warning Plaintiffs to "remain vigilant," report any "identity theft" and "fraud," and take steps to protect themselves from those risks. Concerned, Plaintiffs did just that, spending "considerable time and effort" monitoring their accounts and mitigating their chances for fraud. But despite the time they devoted to dealing with the breach, Plaintiffs cannot reclaim the privacy they lost, nor can they change the data elements exposed, like their Social Security numbers. As a result, they will live under a "lifetime risk of identity theft." DTiQ knows this. Its breach letter reiterated the "privacy and security of [employee] information is important to us, and we will continue to take steps to protect information in our care[.]" But DTiQ never offered the compensation needed to remediate the harm its breach caused nor ensured it has taken all "reasonable" steps to stop breaches in the future. Thus, Plaintiffs sued DTiQ to recover their losses and demand that Defendant improve its security.

In response, DTiQ backpedals on what it said in its breach notice. After reassuring Plaintiffs that cybersecurity is "important" to DTiQ and advising them on the steps they should take to protect themselves, it recants and says its breach cannot have caused any harm. Worse,

after Plaintiffs took the steps Defendant advised them to take considering the risk its breach posed, it now minimizes the risk as "speculative" and any efforts to mitigate as unneeded, contradicting its breach notice and the law. Indeed, DTiQ's brief reads as if its breach caused no harm at all. But it did, and the law affords Plaintiffs relief for breaching that duty.

As a result, the Court should deny DTiQ's motion for two reasons. ***First***, DTiQ's breach harmed Plaintiffs and that harm confers their standing to sue under Article III. And ***second***, DTiQ breached its duty to Plaintiffs under tort and contract principles, allowing them to sue under those principles under the causes alleged.

## BACKGROUND

DTiQ is a private company headquartered in Marlborough, Massachusetts that offers video surveillance and loss prevention technology for quick-service restaurants, convenience stores, and retailers. Amended Class Action Complaint (ECF No. 17) ("Am. Compl.") ¶ 21. To facilitate employment, DTiQ required Plaintiffs and Class members to provide it with their sensitive PII, including their Social Security numbers. *Id.* ¶ 22. In so doing, DTiQ agreed that it would safeguard the data in accordance with state and federal law and even promised its employees that "your personal data will not be disclosed to third parties." *Id* ¶¶ 23-25. Despite these promises and obligations, DTiQ failed to implement adequate data security measures, which resulted in the Data Breach. *Id.* ¶ 26.

### A. DTiQ breaches its duties

In January 2025, DTiQ "identified unusual activity" on its computer network. *Id*. ¶ 31. In the notice letter it sent to Data Breach victims (the "Breach Notice"), DTiQ admitted it uncovered "unauthorized access" to "a portion of its network" between December 31, 2024, and January 12, 2025. *Id*. at ¶¶ 31–32, Ex. A. Thus, DTiQ failed to detect or stop its Data Breach for thirteen days, allowing criminals unfettered access to the PII of 4,693 individuals. *Id*. ¶¶ 1, 31–34. The breach's

scope impacted all aspects of Plaintiffs' identities, including names, Social Security numbers, and "financial account information." *Id.* ¶ 28. Even so, DTiQ did not begin notifying Plaintiffs and Class members of their exposure in the Data Breach until July 25, 2025—207 days after Defendant discovered the breach, preventing Plaintiffs and the class from taking steps to mitigate their injuries and prevent future harm. *Id.* ¶¶ 35–36.

### B. Plaintiffs' experiences

DTiQ required Plaintiffs to provide their PII to work at the company, including their names, Social Security numbers and financial account information. *Id.* ¶¶ 62, 77, 94. Because DTiQ failed to safeguard that PII, criminals stole it, violating their privacy and exposing them to harm including identity theft, and other misuse. *Id.* ¶¶ 70, 73, 82-83, 88, 91, 99-104, 110. Exacerbating the harm, DTiQ delayed notification, allowing Plaintiffs' PII to circulate on the dark web while some used it to commit fraud. *See id.* ¶¶ 71, 80, 97. In May 2025, four months after the breach, an unknown individual tried to charge Plaintiff Morton's credit card, spamming the account with transaction requests for $39 each time—fraud Mr. Morton needed to devote time and resources to preventing and remediating. *Id.* ¶¶ 82-83. So too for Christopher Crawley, as he received alerts criminals were trying to assume his identity and sign in to his financial accounts. *Id.* ¶ 99. The harm for him mushroomed from there when criminals misused Mr. Crawley's PII to apply for 11 loans in his name, forcing him to spend over 60 hours reporting the fraud to the lenders involved, disputing the accounts with the credit buraus, freezing his credit, and attempting to remove the applications from his credit reports. *Id.* ¶¶ 99-101. Those efforts required his time, effort, and money—damages DTiQ refuses to compensate him for, even though Mr. Crawley would never have faced this risk but for DTiQ's breach. *Id.* ¶ 102.

As the above makes clear, Plaintiffs have suffered harm and have devoted time to remediating and mitigating their chances for suffering additional harm in the future.

## LEGAL STANDARDS

Motions under Rule 12(b)(1) assess whether a district court has subject matter jurisdiction. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Here, the court must take the facts in the complaint "at face value," construing them "in the light most congenial to [plaintiff]." *Royal v. Leading Edge Prods.*, 833 F.2d 1, 1 (1st Cir. 1987). Thus, "[d]ismissal can be justified only if it clearly appears that no colorable hook exists upon which subject matter jurisdiction can be hung." *Id.*

Under Rule 12(b)(6), plaintiffs need only "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Courts must "accept as true all well-pleaded facts and draw all reasonable inferences therefrom." *Keach v. Wheeling & Lake Erie Ry. Co.*, 888 F.3d 1, 6 (1st Cir. 2018). Thus, the court must sustain plaintiffs' claims when their "factual allegations are sufficient to support the reasonable inference that the defendant is liable." *Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016) (internal quotation omitted).

## ARGUMENT

### A. Plaintiffs have standing under Article III

Plaintiffs have standing because the breach harmed them, threatens to harm them again, and has required them to spend time and resources mitigating that harm. Those facts satisfy standing's three requirements: (1) an injury-in-fact, (2) that is fairly traceable to defendant's alleged conduct, and (3) is likely to be redressed by a favorable court ruling. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). More specifically, the injury-in-fact must be concrete, particularized, and actual or imminent (not conjectural or hypothetical). *Id.* An injury-in-fact is "concrete" when it has a close relationship to a harm traditionally recognized in American courts. *Id.* at 2204. Thus, "physical harms and monetary harms" are clearly concrete but intangible harms,

such as "reputational harms, disclosure of private information, and intrusion upon seclusion" also qualify as concrete. *Id*.

      i.   A "disclosure of private information" is an injury in-and-of-itself[1]

The "disclosure of private information," on its own, is confers standing. In *TransUnion v. Ramirez*, the Supreme Court restated Article III's principles and applied them to claims involving a "risk of future harm." 141 S. Ct. at 2210. The *TransUnion* plaintiffs alleged TransUnion violated the Fair Credit Reporting Act by mislabeling them as "terrorists, drug traffickers, or other serious criminals" in their credit reports. *Id*. at 2201. The Court had "no trouble concluding" those plaintiffs had standing because those plaintiffs "suffered a harm with a 'close relationship' to the harm associated with the tort of defamation." *Id*. at 2209

As in *TransUnion*, Plaintiffs here allege criminals stole their "sensitive" PII, causing them to spend resources mitigating their risk for suffering fraud and identity theft. District courts across the country have applied *TransUnion* to data breach cases and found that breach victims have standing as the harm they suffer bears a "close relationship" to the "disclosure of private information," a "traditional" harm. *See Ives v. Bath & Body Works, LLC*, 2024 DNH 034, 731 F. Supp. 3d 254, 261 ("Plaintiff has adequately alleged an invasion of his privacy that bears a sufficiently close relationship to a harm traditionally recognized in American law") (*citing TransUnion*, 594 U.S. at 425); *Bohnak v. Marsh & McLennan Cos., Inc.*, 580 F. Supp. 3d 21, 30 (S.D.N.Y. Jan. 17, 2022) ("in light of the *TransUnion* Court's admonition that common-law analogs need not provide 'an exact duplicate,'… I find the fit sufficiently close."); *see also Clemens v. ExecuPharm Inc.*, No. 21-1506, 2022 WL 4005322, at 7 (3d Cir. Sept. 2, 2022) (the

---

[1] While the parties both cite *Webb v. Injured Workers Pharmacy, LLC*, plaintiffs there did not argue a "disclosure" alone conferred standing in that case. 72 F.4th 365, 378 (1st Cir. 2023). Because Plaintiffs do here, the Court should consider this argument.

alleged injury was "concrete, because the harm involved is sufficiently analogous to harms long recognized at common law like the "'disclosure of private information.'") (citing *TransUnion*, 141 S. Ct. at 2204). Thus, Plaintiffs have standing on this ground alone.

      ii.  <u>Fraud and identity theft confer standing</u>

In *Webb v. Injured Workers Pharmacy, LLC*, a pharmacy service experienced a data breach where hackers stole the PII of over 75,000 patients. 72 F.4th at 369-70. One named plaintiff alleged her PII was used to file a fraudulent tax return and she expended considerable time communicating with the IRS to resolve issues associated with the false return. *Id*. at 370. Another plaintiff alleged damages by way of fears for her financial security, the time and effort spent monitoring her accounts, and "feelings of rage and anger, anxiety, sleep disruption, stress, fear, and physical pain." *Id*.

The court held various factors should be considered when determining whether Article III standing has been adequately pled in a data breach action: (1) whether the plaintiff's PII was deliberately taken by thieves intending to misuse the data; (2) whether any portion of the PII has been misused; and (3) whether the PII exposed was sensitive such that there is a high risk of identity theft or fraud. *Id.* at 375. Contrary to Defendant's postulation that the *Webb* plaintiffs' "claim met standing requirements *only* because the Amended Complaint 'alleges that at least some of the stolen PII has already been misused,'" the *Webb* court cautioned that the above factors are neither exclusive nor determinative. *Id.*; *In re MOVEit,* No. 1:23-cv-12059-IT, 2024 U.S. Dist. LEXIS 224712 at *64 (finding actual misuse is not a necessary component of establishing standing, even if courts are more likely to find standing where there is some actual misuse). As for the misuse of stolen data, the *Webb* court held that if "information stolen in a data breach has

already been misused also makes it likely that other portions of the stolen data will be similarly misused." *Webb*, 72 F.4th at 376.

Applying those factors here, Plaintiffs have established standing because they allege: (1) DTiQ's Data Breach was the result of a targeted attack by cybercriminals; (2) the cybercriminals, by DTiQ's own admission, had "unauthorized access" to the PII stored on its network; and (3) Plaintiffs' PII has already been misused to commit fraud attempts, to open unauthorized accounts, and to perpetuate unwanted spam and scam phone calls and texts. Am. Compl. ¶¶ 31-34, 43-49, 70, 82-83, 99-104. Under binding precedent in the First Circuit, these allegations suffice to demonstrate standing at the pleading stage. *In re MAPFRE Data Disclosure Litig.*, No. 1:23-cv-12059-IT, 2025 U.S. Dist. LEXIS 62111, at *19 (D. Mass Mar. 31, 2025) (finding standing based on allegations that "unauthorized third parties obtained [plaintiff's] driver's license number in the Data Disclosure, and that her PI was used to submit a fraudulent claim for unemployment benefits in her name shortly thereafter."); *Priddy v. Zoll Med. Corp.*, No. 1:23-cv-10575-IT, 2025 U.S. Dist. LEXIS 62112, at *14 (D. Mass Mar. 31, 2025) (holding plaintiffs pled standing where they experienced financial fraud after their PII was compromised in a data breach).

Second, DTiQ's contention that Plaintiffs lack standing because Plaintiff Morton and Plaintiff O'Brien "do not plausibly allege misuse of any of their information" is baseless. Def.'s Mem. at 7. As explained above, Plaintiff O'Brien's allegations that he experienced spam and scam communications, in addition to Plaintiff Morton's allegations of attempted fraudulent charges and Plaintiff Crawley's allegations that loans were taken out in his name, are sufficient to allege "misuse" of PII and confer standing in the First Circuit. Am. Compl. ¶¶ 70, 82-83, 99-103. *Webb*, 72 F.4th at 375 (holding the actual misuse of PII stolen in a data breach experienced by one plaintiff increases the risk that other information will be misused in the future and confers standing on all

plaintiffs); *In re LastPass Data Sec. Incident Litig.*, 742 F. Supp. 3d 109, 121 (D. Mass. July 30, 2024) (ruling plaintiffs alleged standing via allegations of "fraudulent credit card charges, unauthorized applications for loans and credit cards, sale of information on the 'dark web,' and increased phishing attempts and spam messages).

Finally, Defendant's argument that Plaintiff Morton's allegations of attempted fraudulent charges to her credit card fail because there is "no allegation that she ever provided credit card information to DTiQ" lacks merit. Def.'s Mem. at 7. Plaintiff Morton alleges that her name, Social Security number, and financial account information were stolen in DTiQ's Data Breach. Am. Compl. ¶¶ 28-34. Plaintiff Morton also alleges she has not been subject to another data breach and that cybercriminals often create comprehensive dossiers on individuals known as "Fullz" packages, which allow fraudsters to marry the PII stolen in the Data Breach with other information found online to commit acts of fraud. *Id.* ¶¶ 81-83, 118-120. Thus, Plaintiffs have alleged that, even if the stolen data did not contain credit card numbers, data thieves can compile "Fullz" packages with PII that can be sold to third parties to be later used for illegal purposes. *Id.* ¶¶ 81-83.

The cases DTiQ relies on are inapposite. In *Taylor v. Ukg, Inc.*, 693 F. Supp. 3d 87, 98 (D. Mass Sept. 15, 2023) the court found the Plaintiffs lacked standing because, although they alleged their PII was exposed to hackers, they did not allege any misuse of their or others' PII. *Id.* ¶ 97. The court contrasted the *Taylor* plaintiff's claims, which primarily focused on an increased risk of future identity theft, with cases where the plaintiffs had established standing based on allegations that PII "was actually accessed and used," such as "allegations of . . . fraudulent filing of tax returns under the names of several named plaintiffs." *Id.* ¶ 99 (quoting *Portier v. NEO Tech. Sols.*, No. 3:17-cv-30111-TSH, 2019 U.S. Dist. LEXIS 227494, at *22 (D. Mass Dec. 31, 2019)). Similarly,

in *Hartigan v. Macy's, Inc.*, 501 F. Supp. 3d 1, 5 (D. Mass Nov. 5, 2020) the court held that the plaintiff lacked standing because there were "no allegations of any fraudulent use or even attempted use of the personal information to commit identify theft."

Unlike *Taylor* and *Hartigan*, Plaintiffs here plead that their PII was stolen and misused. Plaintiff Morton alleges she experienced fraud attempts on her credit card account and Plaintiff Crawley pleads that his PII was used for fraud attempts to his financial accounts and to open 11 personal loans in his name. Am. Comp. ¶¶ 82, 99-100. Plaintiffs O'Brien and Morton plead they received unwanted spam and scam calls and texts as a result of the Data Breach. *Id.* ¶¶ 70, 88.

### iii.    The misuse Plaintiffs suffered traces to the data breach

Plaintiffs' allegations meet their pleading burden and establish traceability. To sufficiently plead traceability in the First District, the plaintiff must show a sufficiently direct causal connection between the challenged action and the identified harm. *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020). Traceability is not the same as "[p]roximate causation." *Webb v. Injured Workers Pharmacy, LLC,* 72 F.4th 365, 377 (1st Cir. 2023). In the context of a data breach, an injury is "fairly traceable" to a defendant's conduct for the purposes of Article III standing if plaintiffs plausibly allege the defendant's actions led to the exposure and actual or potential misuse of the plaintiff's PII. *In re LastPass*, 2024 U.S. Dist. LEXIS 134178 at *14.

DTiQ argues that Plaintiffs' claims are not traceable to the Data Breach because the type of data the cybercriminals stole could not have resulted in the fraud alleged. Def.'s Memo. at 7-8. DTiQ is wrong. To start, in *In re MOVEit*, the court rejected DTiQ's identical "data mismatch" argument in the context of a data breach. The *In re MOVEit* court held:

> Defendants' "data match" argument may raise significant factual issues, but, as a matter of law, *it does not foreclose plausible allegations of harm sufficient to*

*establish standing*…Even if the data accessed in the Data Breach did not provide all the information necessary to inflict some of the harms Plaintiffs' allege, where the breach has included sensitive PII, like SSNs and DOBs, that data very well could have been enough to aid therein. [citations omitted]… It is worth noting, as well, *that even in a case of total data mismatch — which would undercut a particular plaintiff's claim of actual injury — the plaintiff would still be able to assert standing based on a substantial risk of future harm…*,

MDL No. 1:23-md-03083-ADB-PGL, U.S. Dist. LEXIS 224712 at *76 (D. Mass. Dec. 12, 2024) (emphasis added). The Court should follow the well-reasoned holding in *In re MOVEit* and reject DTiQ's assertion Plaintiff Morton's fraud allegations "merely establish the misuse of that credit card." Def.'s Mem. at 7.

Next, *Scifo v. Alvaria, Inc.,* No. 23-cv-10999-ADB, 2024 U.S. Dist. LEXIS 170093, at *11 (D. Mass. Sept. 20, 2024) and the other matters relied on by DTiQ are not analogous to this case. For example, *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc*., 958 F.3d 38, 48 (1st Cir. 2020) is a case about ocean freight carriers where the court held that the plaintiff's allegations were not traceable to the harm alleged because they relied on a "bare hypothesis" that certain costs were passed on to the plaintiff. *Dantzler* has nothing do to with this case.

Moreover, in *Scifo*, this Court found the plaintiffs did not establish traceability because they did not allege "how the disclosure of [] loan numbers and balances, telephone numbers, mailing addresses, and the last four digits of Social Security numbers could be parried into unauthorized debit purchases." *Id*. Here, in contrast, Plaintiff Morton and Plaintiff Crawley allege they have not experienced another data breach, their names, their full Social Security numbers and their financial information were stolen in DTiQ's Data Breach, and they experienced fraud attempts and Plaintiff Crawley experienced fraudulent loan applications made his name in the months after the breach. Am. Compl. ¶¶ 28-34, 82-83, 99-103. As in *Webb*, where the First District held that the theft of names and Social Security numbers in a data breach were traceable to a

fraudulent tax return filed in the plaintiff's name in the next year, Plaintiffs' allegations here are sufficient to establish traceability. *Webb*, 72 F.4th at 370, 376-377; *Priddy*, 2025 U.S. Dist. LEXIS 62112, at *13 (finding traceability where the plaintiff alleged the PII stolen in a January 2021 data breach was used to file a false 2021 tax return in her name); *In re LastPass*, 742 F. Supp. 3d at 122 (holding plaintiffs' injuries traceable where they "plausibly alleged third parties obtained their sensitive information from the data breach and not from elsewhere.")

Because Plaintiffs' injuries are presently occurring and directly traceable to the compromise of their PII in the Data Breach, DTiQ's argument should be rejected.

iv.   <u>The risk of future harm confers standing</u>

Plaintiff's allegations that they face substantially increased risks of fraud, of misuse of their PII, and of identity theft because of the Data Breach, and that they will have to spend time monitoring their accounts to mitigate the risk of fraud, (Am. Compl. ¶¶ 73, 68, 86, 91, 108, 110) state cognizable injuries. As explained above, evaluating the risk of future misuse from a data breach is a fact-specific inquiry, for which the First Circuit applied the following factors: (1) whether the plaintiffs' data has been exposed as the result of a targeted attempt to obtain that data; (2) whether any portion of the dataset has already been misused, even if the plaintiffs themselves have not yet experienced identity theft or fraud; and (3) whether the type of data that has been exposed is sensitive such that there is a high risk of identity theft or fraud. *Webb*, 72 F.4th at 375.

In *Priddy*, the plaintiff alleged that the data breach at issue was the result of a targeted attack, some Plaintiffs alleged financial fraud traceable to the breach, and the PII exposed in the Data Breach included names, dates of birth, and at least some Social Security numbers. 2025 U.S. Dist. LEXIS 62112, at *19-20 (citing *Webb*, 72 F.4th at 370). This is precisely what Plaintiffs have alleged. Am. Compl. ¶¶ 28-34, 82-83, 99-103.

DTiQ asserts that Plaintiffs allegations do not meet the first factor because Plaintiffs Amended Complaint does not identify the "threat actor" group responsible for the attack, the methods used by the threat actor to conduct the attack and/or access the defendant's network, and evidence of the group's *modus operandi*. Def.'s Mem. at 9. Defendant cites no authority for such a requirement. Indeed, in addition to *Priddy*, courts throughout the First District have found allegations similar to Plaintiffs' sufficient to grant standing based on the risk of future harm. *In re LastPass* Data, 742 F. Supp. 3d at 123 ("[c]osts of future credit monitoring are also cognizable injuries."); *In re MAPFRE*, 2025 U.S. Dist. LEXIS 62111, at *29-30 (same); *In re Shields Health Care Grp., Inc. Data Breach Litig.*, 721 F. Supp. 3d 152, 161 (D. Mass. Mar. 5, 2024) ("Where Plaintiffs show a substantial risk of harm manifesting in the future, the element of injury and damage will have been satisfied and the cost of that monitoring is recoverable in tort."); *In re LastPass*, 742 F. Supp. 3d at 123 (same).

Thus, Plaintiffs have adequately stated cognizable Article III injuries based on impending injury and Defendant's motion should be denied.

     v.  <u>Lost time confers standing</u>

Plaintiffs lost time and effort responding to the Data Breach—and critically, "time spent responding to a data breach can constitute a concrete injury." *Webb*, 72 F.4th at 377 (finding standing when plaintiffs "spent considerable time and effort monitoring [their] accounts"). Because such injuries are "a response to a substantial and imminent risk of harm" then such plaintiffs are not "manufactur[ing] standing." *Id*. (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 422 (2013)); *see also In re Shields Health Care Grp., Inc.*, Civil Action No. 22-10901, 2024 U.S. Dist. LEXIS 38082, at *11 n.5 (D. Mass. Mar. 5, 2024) (explaining that allegations

of "lost time . . . are sufficient for Article III"). As detailed above, both Plaintiffs lost time responding to the Data Breach. Compl. ¶¶68, 86. These allegations are sufficient.

### vi. Plaintiffs sufficiently allege standing to seek injunctive relief

Plaintiffs have standing to seek injunctive relief—indeed, a "material risk of future harm can satisfy the concrete-harm requirement in the context of a claim for injunctive relief[.]" *TransUnion*, 141 S. Ct. at 2198. To be sure, in *Webb*, there was no "material risk of future harm" given that defendant had "implemented new security safeguards to prevent and mitigate data breaches." 72 F.4th at 378. Here, by contrast, DTiQ states only that "the privacy and security of [employees] information is important to [DTiQ]." Am. Compl. ¶ 34. Thus, until DTiQ ***actually improves*** its security, then Plaintiffs and Class Members still face a material risk of future harm and have a "continuing interest in ensuring that [their] PII . . . is protected and safeguarded from future breaches." *Id*. ¶¶ 74, 92, 111.

### B. DTiQ was negligent

Because Plaintiffs have standing under Article III, the "same logic" establishing that standing "supports plaintiff's claim for damages." *Weekes v. Cohen Cleary P.C.*, 723 F. Supp. 3d 97, 103 (D. Mass. Mar. 15, 2024). Massachusetts courts have held that allegations like Plaintiffs' suffice to establish cognizable injuries at this early stage. *Id*. at *8–9; *Webb*, 2023 U.S. Dist. LEXIS 161097, at *5–7; *Priddy*, 2025 U.S. Dist. LEXIS 62112, at *33 (sustaining negligence claim when the defendant could foresee it would be expected to act to protect Plaintiffs' PII).

Those injuries take five forms. First, Plaintiffs' identity theft and fraud (as detailed above) are cognizable injuries. *Webb*, 2023 U.S. Dist. LEXIS 161097, *6 (denying dismissal when plaintiffs alleged a fraudulent tax return filing); *Weekes*, 2024 U.S. Dist. LEXIS 47673, *9 (denying dismissal because "[i]f proven true, damages caused by the actual misuse . . . of plaintiff's PII satisfy the damages requirement").

Second, Plaintiffs' heightened risk of future harm (as detailed above) are cognizable injuries. *Webb*, 2023 U.S. Dist. LEXIS 161097, *6 (denying dismissal when plaintiffs alleged that they "remain at a continued risk of harm"); *In re Shields*, 2024 U.S. Dist. LEXIS 38082, at *10 (D. Mass.) (denying dismissal because plaintiffs "allege they will have to monitor their online accounts continually because of the ongoing risk" and "the cost of that monitoring is recoverable in tort") (citing *Donovan v. Philip Morris USA, Inc*., 914 N.E.2d 891, 901 (Mass. 2009)).

Third, Plaintiffs lost the "benefit of the bargain" (which is a cognizable injury). In *Hartigan v. Macy's, Inc*., 501 F. Supp. 3d 1, 6 (D. Mass. 2020), the court rejected the "loss of the benefit of the bargain" theory only because plaintiff "fail[ed] to allege specific facts that plausibly support his claim that [defendant] breached its privacy policy." *Id*. at *6. Here, DTiQ's "Privacy Policy" promised that "your personal data will not be disclosed to third parties;" and DTiQ is committed to safeguarding your information to the best of its ability. Am. Compl. ¶ 25. DTiQ breached this policy as shown by the Data Breach.

Fourth, the damages to Plaintiffs' PII (as detailed above) are cognizable injuries. *Webb*, 2023 U.S. Dist. LEXIS 161097, *6 (denying dismissal when plaintiffs alleged "damages to and diminution in the value of [their] PII"). And fifth, Plaintiffs' emotional injuries (as detailed above) are cognizable injuries. *Webb*, 2023 U.S. Dist. LEXIS 161097, *6 (denying dismissal when plaintiffs alleged "anxiety, fear, sleep disruption, stress"); *Maio v. TD Bank, N.A*., Civil Action No. 1:22-CV-10578-AK, 2023 U.S. Dist. LEXIS 40482, at *5 (D. Mass. Mar. 10, 2023) (same). **Sixth**, Plaintiffs' lost time and effort (as detailed above) are cognizable injuries. *Webb*, 2023 U.S. Dist. LEXIS 161097, *6 (denying dismissal when plaintiffs alleged that they "spent considerable time and effort"); *Weekes*, 2024 U.S. Dist. LEXIS 47673, *9 (denying dismissal of negligence

claim because "efforts expended to prevent imminent misuse of plaintiff's PII satisfy the damages requirement").

Last, the economic loss doctrine does not bar Plaintiffs from recovering those losses. While DTiQ cites *Sullivan* to claim the contrary, it omits *Sullivan's* key reasoning, including that "emotional distress" allegations render dismissal improper. Def.'s Mem. at 12; *Webb*, 2023 U.S. Dist. LEXIS 161097 at *6 (denying dismissal because allegations of "emotional distress [are] sufficient to satisfy the 'personal injury' exception to the economic loss doctrine"); *McCormick v. Lischynsky*, Civil Action No. 19-10433-FDS, 2019 U.S. Dist. LEXIS 126406 at *12 (D. Mass. July 30, 2019) (holding allegations of "emotional distress . . . allege[] a personal injury sufficient to overcome the economic-loss doctrine"); *Maio v. TD Bank, N.A.*, Civil Action No. 1:22-CV-10578-AK, 2023 U.S. Dist. LEXIS 40482 at *13 (D. Mass. Mar. 10, 2023) (same). Thus, a court should only dismiss a case under the doctrine if a plaintiff fails to allege emotional injuries. *Eggiman v. Bank of Am., N.A.*, Civil Action No. 1:22-cv-10298-ADB, 2023 U.S. Dist. LEXIS 52029, at *9–15 (D. Mass. Mar. 27, 2023) (dismissing when plaintiffs' alleged injuries were "purely economic"); *Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 918 N.E.2d 36, 47 (Mass. 2009) (same); *Zoll Med. Corp. v. Barracuda Networks, Inc.*, 565 F. Supp. 3d 101, 107 (D. Mass. 2021) (same). And here, Plaintiffs allege just that, as they experienced "feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach." Am. Compl. ¶¶ 72, 90, 109. As a result, Plaintiffs

To support their negligence cause of action, Plaintiffs allege Defendant violated its duties under the FTC Act. Am. Compl. ¶¶ 124-129. Further, Plaintiffs' negligence claim is not based solely on violations of the FTC Act, but on Defendant's failure to comply with industry standards or otherwise take reasonable steps to secure Plaintiffs' PII. *Id*. ¶¶ 130-133. Defendant failed to

take such basic steps as properly securing and encrypting the files and file servers containing Plaintiffs' and Class Members' PII and training its employees on standard cybersecurity practices. *Id*. Defendant also acted negligently in failing to notify Plaintiffs of the breach in timely manner. *Id*. ¶¶ 73, 91, 110. Thus, the Court should construe Plaintiffs' claim under this theory as incorporated within Plaintiffs' negligence claim, as the FTC Act informs the standard of care DTiQ owed to Plaintiffs.

Accordingly, there is no basis for dismissing Plaintiffs negligence claim.

## C. DTiQ breached its implied contractual duties

Plaintiffs properly alleged the breach of an implied contract—which "may be inferred from the conduct of the parties and the relationship of the parties." *In re Shields Health Care Grp.*, *Inc. Data Breach Litig.*, 721 F. Supp. 3d 152, 162 at *13 (D. Mass. Mar. 5, 2024). Critically, "implied contract claims can be based on promises made in websites." *Id*. And "[e]ven in the absence of allegation of assent either expressly or by conduct, Plaintiffs can prevail if they demonstrate a contract implied in law." *Id*. at *14. Further, courts "find a contract implied in law when reasonable expectations of the plaintiffs are defeated." *Id*. (internal quotations omitted).

In the data breach context, Massachusetts case law provides clear guidance. First, in *Weekes*, the implied contract claim was deficient because plaintiff failed to "explain how an implied contractual relationship formed from the particular conduct of the parties." 2024 U.S. Dist. LEXIS 47673, *11. Second, in *Webb*, the claim was deficient because plaintiffs only cited "post-breach assurances given by [defendant]." 2023 U.S. Dist. LEXIS 161097, *9. But as explained below, Plaintiffs' allegations lack these deficiencies.

Plaintiffs' allegations mirror those in *In re Shields* (where the court denied dismissal). 2024 U.S. Dist. LEXIS 38082, at *14–15. There, plaintiffs plausibly "had an implied-in-law contract"

given that plaintiffs "reasonably expected" that their information would be "ke[pt] private consistent with relevant data privacy laws." 2024 U.S. Dist. LEXIS 38082, at *14–15. Likewise, Plaintiffs here alleged that "[a]s a condition of employment with DTiQ, Plaintiffs provided Defendant with their PII, including but not limited to their names, social security numbers, and financial account information." Am. Compl. ¶ 28. Thus, Plaintiffs "trusted that [DTiQ] would use reasonable measures to protect [PII] according to state and federal law." Am. Compl. ¶¶ 63, 78, 95. Indeed, DTiQ promised in its Privacy Policy—which *predates* the Data Breach—that the "protection of your personal data is important to us." *Id.* ¶ 25. Thus, Plaintiffs' allegations align with *In re Shields* and Defendant's argument should be rejected. *See also Springer v. Johnson & Wales Univ.*, (case nos. omitted), 2025 U.S. Dist. LEXIS 84117, at *12-13 (D.R.I. Apr. 30, 2025) (finding "when an individual is required to turn over sensitive information as a condition of employment…it only makes sense that the employer…would accept that PII with the promise that it would keep it safe.")

Finally, DTiQ claims that "the Complaint is devoid of any facts showing that Plaintiffs incurred damages." Def.'s Mem. at 15. Defendant again ignores Plaintiffs' allegations. Plaintiff Crawley pleads that he "spent money mailing letters to the credit buraus in order to freeze his credit and to report the fraud. Am. Compl. ¶ 102. Accordingly, Plaintiffs provided their PII to Defendant as a condition of employment, Defendant implicitly agreed to safeguard that information, and Plaintiffs suffered harm when Defendant failed to do so. These allegations are sufficient to state a claim for breach of implied contract at the pleading stage.

**D.  DTiQ unjustly enriched itself at Plaintiffs' expense**

Plaintiffs sufficiently stated an unjust enrichment claim under Massachusetts law. Unjust enrichment is "defined as retention of money or property of another against the fundamental

principles of justice or equity and good conscience." *Santagate v. Tower*, 64 Mass. App. Ct. 324, 329, 833 N.E.2d 171 (2005). In *Webb*, plaintiffs' allegations failed because they did not allege that "[defendant] profited in any way[.]" 2023 U.S. Dist. LEXIS 161097, at *10. In contrast, in *In re Shields*, the court denied dismissal when plaintiff alleged that "[defendant] unjustly enriched itself by . . . not using [funds] to pay for the administrative costs of reasonable data privacy and security." 2024 U.S. Dist. LEXIS 38082, at *19–20. Similarly, in *Shedd v. Sturdy Mem. Hosp.*, the court denied dismissal when plaintiffs alleged that they "conferred a monetary benefit" but that "[defendant] enriched itself by not using the funds to provide a reasonable level of security." No. 2173CV00498C, 2022 Mass. Super. LEXIS 7, at *29 (Apr. 5, 2022).

Here, Plaintiffs' allegations are sufficient—and mirror those allegations in *In re Shields* and *Shedd*. After all, Plaintiffs "conferred a benefit upon Defendant in the form of services through employment." Am. Compl. ¶ 204. Thus, Plaintiffs "trusted that [DTiQ] would use reasonable measures to protect [Plaintiffs' PII]." Am. Compl. ¶¶ 63, 78, 95. Regardless, DTiQ betrayed that trust and retained the "full value of Plaintiffs' and the proposed Class's services and their PII because Defendant failed to adequately protect their PII." Am. Compl. ¶ 205. But Plaintiffs "would not have provided their PII or worked for Defendant at the payrates they did had they known Defendant would not adequately protect their PII." *Id*.

DTiQ avers that it did not "receive any direct benefit" from Plaintiffs' PII. Def.'s Mem. at 16-17. Defendant again simply ignores the allegations in the Amended Complaint. Plaintiffs allege Defendant was unjustly enriched because Plaintiffs would not have worked for Defendant, would not have provided their PII, or would have required higher pay, if they knew Defendant was not providing adequate data security. Am. Compl. ¶ 205. These allegations are sufficient.

### E.  DTiQ's breach invaded Plaintiffs' privacy

Under Massachusetts law, invasion of privacy requires only "(1) a gathering and dissemination of facts of a private nature that (2) resulted in an unreasonable, substantial, or serious interference with his privacy." *Webb*, 2023 U.S. Dist. LEXIS 161097, *11; *see also* M.G.L. c. 214, § 1B. Here, Plaintiffs adequately alleged that DTiQ collected, maintained, and then exposed their highly sensitive PII—which caused substantial interference in their privacy (as shown by the resultant instances of identity theft and fraud). Am. Compl. ¶¶ 22-23, 28-34, 84, 106.

Moreover, DTiQ misstates the degree to which intentionality must be established at this early stage. Def.'s Mem. at 18. For example, in *In re Shields*, the court noted that "***some*** courts have held invasion of privacy is an intentional tort[.]" 2024 U.S. Dist. LEXIS 38082, at *18 (emphasis added). Thus, in *Shedd*, the court denied dismissal when plaintiffs alleged "that unauthorized persons gained access to their personal and highly confidential information due to [defendant's] inadequate, negligent and/or intentionally insufficient security measures." 2022 Mass. Super. LEXIS 7, *32. Likewise, in *Walker v. Bos. Med. Ctr. Corp*., the court denied dismissal—even when the thrust of the complaint was that private information was "inadvertently made accessible." 33 Mass. L. Rep. 179 (2015). Thus, Plaintiffs allegations are sufficient, and dismissal is improper.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court deny DTiQ's motion to dismiss in its entirety. If the Court grants any portion of Defendant's motion, then Plaintiffs respectfully request leave to amend.

Dated: December 19, 2025              By: */s/ Raina C. Borrelli*
                                          Raina C. Borrelli
                                          STRAUSS BORRELLI PLLC
                                          One Magnificent Mile
                                          980 N Michigan Avenue, Suite 1610
                                          Chicago IL, 60611

Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

Anthony Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone: (617) 485-0018
Facsimile: (508) 318-8100
anthony@paronichlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

<u>**CERTIFICATE OF SERVICE**</u>

I, Raina C. Borrelli, hereby certify that on December 19, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record via the ECF system.

DATED this 19th day of December, 2025.

STRAUSS BORRELLI PLLC

By:  */s/ Raina C. Borrelli*
       Raina C. Borrelli
       raina@straussborrelli.com
       STRAUSS BORRELLI PLLC
       One Magnificent Mile
       980 N Michigan Avenue, Suite 1610
       Chicago IL, 60611
       Telephone: (872) 263-1100
       Facsimile: (872) 263-1109