UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ELIZABETH MORTON, KEVIN O'BRIEN, and CHRISTOPHER CRAWLEY, on behalf of themselves and all others similarly situated, | * | |
| Plaintiffs, | * | Civil Action No. 25-cv-12271-ADB |
| v. | * | |
| DTIQ TECHNOLOGIES, INC., | * | |
| Defendant. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Elizabeth Morton, Kevin O'Brien, and Christopher Crawley (together, "Plaintiffs") bring this action on behalf of a putative class to recover damages arising from a data breach suffered by their employer, DTiQ Technologies, Inc. ("DTiQ"). Now before the Court is DTiQ's motion to dismiss Plaintiffs' Amended Complaint, [ECF No. 23]. For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

### A. Factual Background

The following facts are taken from the Amended Complaint, [ECF No. 17 ("Am. Compl.")], the factual allegations of which the Court accepts as true when ruling on a motion to dismiss. See Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).

DTiQ is a California corporation with its headquarters and principal place of business in Massachusetts. [Am. Compl. ¶ 17]. Plaintiffs are former employees of DTiQ who reside in Massachusetts, Pennsylvania, and Illinois. [Id. ¶¶ 14–16, 27]. "As a condition of employment," Plaintiffs shared personally identifiable information ("PII") with DTiQ, including "their names, social security numbers, and financial account information." [Id. ¶ 28].

Beginning on December 31, 2024, cybercriminals accessed DTiQ's network and stole current and former employees' PII. [Am. Compl. ¶¶ 32–33]. DTiQ discovered the attack on January 12, 2025, and began an investigation that same day, [id. ¶ 31], but it did not begin notifying current and former employees of the attack until July 25, 2025, [id. ¶ 35], and Plaintiffs only received notice on August 6, 2025, [id. ¶ 36]. Much of the Amended Complaint focuses on three themes: the alleged insufficiency of DTiQ's cybersecurity systems, see [id. ¶¶ 23–26, 29–30, 33–34, 37–40, 49, 57, 65, 80, 97, 122–133], Plaintiffs' supposition that the attack suffered by DTiQ was a ransomware attack for which DTiQ should have been better prepared, see [id. ¶¶ 43–46, 50–59], and Plaintiffs' contention that DTiQ's delay in advising its current and former employees of the attack worsened their harm, see [id. ¶¶ 64, 73, 79, 91, 96, 110, 121].

As to damages, O'Brien alleges that his harms as a result of the data breach include "damages to and diminution in the value of his PII," time spent "monitoring his accounts to protect himself from identity theft," a "substantial increase in spam and scam phone calls and text messages," "feelings of anxiety, sleep disruption, stress, fear, and frustration," and a "present and continuing risk of fraud, identity theft, and misuse." [Am. Compl. ¶¶ 67–73]. Morton, who is unaware of any previous compromises of her PII, [id. ¶ 81], experienced several attempted fraudulent charges to her credit card in May 2025, [id. ¶ 82], which she believes relied on PII that was stolen in the attack, [id. ¶ 83]. She also alleges damages similar to those alleged

by O'Brien. [Id. ¶¶ 84–91]. Crawley alleges that, following the data breach, strangers tried to fraudulently access and charge his financial accounts and used his PII to apply for loans. [Id. ¶¶ 99–100]. Crawley has spent more than sixty hours trying to remedy the consequences of those fraud attempts and prevent future attempts. [Id. ¶ 101]. He has also received calls from scammers and email notifications related to subscriptions that he did not sign up for, [id. ¶ 104], and he further alleges damages similar to those alleged by O'Brien and Morton, [id. ¶¶ 106–110]. In addition, Plaintiffs allege that their data has now been exposed "for theft and sale on the dark web," [id. ¶ 34], resulting in a "substantially high" "risk of identity theft and unauthorized use," [id. ¶ 42], and also assert that they are "at an increased risk of suffering" a variety of harms, [id. ¶ 113].

### B. Procedural History

Plaintiffs filed their complaint on August 14, 2025. [ECF No. 1]. Defendants moved to dismiss on October 3, 2025, [ECF No. 12], after which Plaintiffs filed the operative Amended Complaint on October 23, 2025, [ECF No. 17]. Defendants filed the instant motion to dismiss on November 20, 2025, [ECF No. 23], and Plaintiffs opposed on December 19, 2025, [ECF No. 27].

## II. LEGAL STANDARD

DTiQ seeks dismissal of the action for lack of jurisdiction, see Fed. R. Civ. P. 12(b)(1), and for failure to state a claim, see Fed. R. Civ. P. 12(b)(6). See generally [ECF No. 24]. "When a court is confronted with motions to dismiss under both Rules 12(b)(1) and 12(b)(6), it ordinarily ought to decide the former before broaching the latter," because "if the court lacks subject matter jurisdiction, assessment of the merits becomes a matter of purely academic interest." Deniz v. Mun. of Guaynabo, 285 F.3d 142, 149–50 (1st Cir. 2002) (first citing Ne.

Erectors Ass'n of BTEA v. Sec'y of Lab., Occupational Safety & Health Admin., 62 F.3d 37, 39 (1st Cir. 1995); and then citing Bell v. Hood, 327 U.S. 678, 682 (1946)).

A motion to dismiss pursuant to Rule 12(b)(1) requires the Court to determine whether the facts as alleged in the complaint, "taken at face value," support the existence of subject matter jurisdiction. Gordo-González v. United States, 873 F.3d 32, 35 (1st Cir. 2017) (citing Muniz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003)). The Court "appl[ies] a standard of review 'similar to that accorded a dismissal for failure to state a claim' under subsection 12(b)(6)." Menge v. N. Am. Specialty Ins. Co., 905 F. Supp. 2d 414, 416 (D.R.I. 2012) (quoting Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995)). It must "accept the factual averments of the complaint as true, and construe those facts in the light most congenial to the [plaintiff's] cause." Royal v. Leading Edge Prods., 833 F.2d 1, 1 (1st Cir. 1987) (first citing Guessefeldt v. McGrath, 342 U.S. 308, 310 (1952); and then citing Chongris v. Bd. of Appeals of Andover, 811 F.2d 36, 37 (1st Cir. 1987)). "Dismissal can be justified only if it clearly appears that no colorable hook exists upon which subject matter jurisdiction can be hung." Id. Even so, the plaintiff "bears the burden of establishing that the federal court has subject-matter jurisdiction." Klimowicz v. Deutsche Bank Nat'l Tr. Co., 907 F.3d 61, 64 (1st Cir. 2018) (citing Gordo-González, 873 F.3d at 35).

A motion to dismiss pursuant to Rule 12(b)(6) requires the Court to determine whether the complaint "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The facts alleged, when taken together, must be sufficient to "state a claim to relief that is plausible on its face." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Detailed factual allegations are not required, but a pleading must set forth "more than labels and conclusions." Twombly, 550 U.S. at 555.

Legal conclusions couched as facts or "[t]hreadbare recitals of the elements of a cause of action" will not suffice. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555); see also Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

## III. MOTION TO DISMISS FOR LACK OF JURISDICTION

### A. Standing to Seek Damages

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016) (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997)). Standing doctrine, which is "rooted in the traditional understanding of a case or controversy[,] . . . ensure[s] that federal courts do not exceed their authority as it has been traditionally understood." Id. at 338 (citing Raines, 521 U.S. at 820). "[T]he 'irreducible constitutional minimum' of standing consists of three elements." Id. (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). The party seeking to bring the lawsuit "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. (citing Lujan, 504 U.S. at 560–61). DTiQ argues that Plaintiffs' Amended Complaint does not adequately allege an injury in fact and, in the alternative, that any alleged injuries are not fairly traceable to DTiQ's conduct. [ECF No. 24 at 5–9].

#### 1. Injury in Fact

To sufficiently plead injury in fact, a plaintiff must plausibly allege "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (citation modified). To be "concrete," an injury must be either a traditionally recognized tangible harm to physical or monetary interests, or an intangible harm that is closely analogous to a traditionally recognized harm. Webb v.

Injured Workers Pharmacy, LLC, 72 F.4th 365, 372 (1st Cir. 2023) (citing TransUnion LLC v. Ramirez, 594 U.S. 413, 424 (2021)).

The First Circuit discussed this principle in the context of data breach cases in Webb, 72 F.4th at 365. To seek damages, Plaintiffs must generally plead "actual misuse of PII," id. at 373 (citing Katz v. Pershing, LLC, 672 F.3d 64 (1st Cir. 2012)), such as the filing of a fraudulent tax return, id., in which case the misuse itself is sufficient even if it does not result in any "more . . . harm," id. at 374. Alternatively, Plaintiffs can plead an "imminent and substantial risk of future misuse of . . . PII" that resulted in a "separate concrete, present harm," such as "lost time spent taking protective measures." Id. at 376; see also Hartigan v. Macy's, Inc., 501 F. Supp. 3d 1, 4–6 (D. Mass. 2020) (developing similar framework before Webb); Taylor v. UKG, Inc., 693 F. Supp. 3d 87, 98–99 (D. Mass. 2023) (applying Webb). To determine whether a risk of future misuse is sufficiently imminent and substantial, the Court looks to whether (1) the PII was "compromised in a targeted attack,"[1] (2) there has been actual misuse of "at least some information stolen in [the] data breach," and (3) the nature of the compromised data was "particularly sensitive." Webb, 72 F.4th at 375–76.[2]

---

[1] DTiQ suggests that "detailed allegations . . . such as the identity of the criminal actors involved, the method or type of cyberattack, and whether any information was actually accessed or stolen" are required, [ECF No. 24 at 9], but this is more stringent than was contemplated by Webb, in which the identity of the hackers appears to have been unknown and the precise method of the attack was only vaguely described, see 72 F.4th at 369 & n.1. The Court will not endorse the stricter rule proposed by DTiQ, which would condition potential plaintiffs' standing on their ability to ascertain information about the cyberattack that is likely outside of their control.

[2] Plaintiffs suggest that Webb left open the possibility that "'disclosure of private information,' on its own, . . . confers standing" and ask the Court to consider that theory. [ECF No. 27 at 6–7 & n.1 (citing Webb, 72 F.4th at 374 n.5, 378)]. Given the Court's analysis in this order, it need not reach that issue.

DTiQ argues that "Morton and O'Brien do not plausibly allege misuse of any of their information" because, it contends, none of the injuries alleged by either party involves use of information that was allegedly stolen in the data breach. [ECF No. 24 at 7]. It does not dispute that Crawley's allegations—that strangers attempted to access his financial accounts and submitted fraudulent loan applications—are sufficient to establish actual misuse of his PII, see [id.], though it contends that such misuse is not traceable to the data breach, [id. at 8].

The Court concludes that Crawley has adequately pleaded an actual-misuse injury and, further, that such actual misuse is adequate to support a risk-of-future-misuse theory of injury for both Morton and O'Brien. See Webb, 72 F.4th at 376–77; cf. Taylor, 693 F. Supp. 3d at 98–99 (looking to whether plaintiffs had "alleged any misuse of their or others' information resulting from the alleged data breach"). Because this analysis establishes concrete injuries for all named plaintiffs, the Court does not reach whether Morton's and O'Brien's claimed injuries would be independently sufficient without Crawley's allegation of actual misuse.

**2. Traceability**

DTiQ next contends that Plaintiffs have failed to establish traceability because they have not shown that the "information involved . . . bear[s] a plausible connection to the harm alleged." [ECF No. 24 at 7–8 (citing Scifo v. Alvaria, Inc., No. 23-cv-10999, 2024 WL 4252694, at *4 (D. Mass. Sep. 20, 2024))]. Having "indulge[d] all reasonable inferences in the plaintiff[s'] favor," however, Webb, 72 F.4th at 374 (quoting In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prods. Liab. Litig., 54 F.4th 28, 34 (1st Cir. 2022)), the Court concludes that Crawley, Morton, and O'Brien have each done enough to "allege[] that [DTiQ's] actions led to the exposure and actual or potential misuse of the plaintiffs' PII," id. at 377 (citing, inter alia, In re Evenflo, 54 F.4th at 41).

As to Crawley's actual-misuse harm, DTiQ argues that because the Amended Complaint defines PII as an individual's "name, social security number, and financial account information" and "a criminal would need vastly more" than that information to apply for a loan in an individual's name, Crawley has failed to establish a plausible connection between his allegations of fraud and the DTiQ breach. [ECF No. 24 at 8 (citing Am. Compl. ¶ 3)]. DTiQ's argument is ultimately unpersuasive because "[e]ven if the data accessed in the [DTiQ breach] did not provide all the information necessary to inflict the[] harms [alleged by Crawley], they very well could have been enough to aid therein." In re Mednax Servs., Inc., Customer Data Sec. Breach Litig., 603 F. Supp. 3d 1183, 1206 (S.D. Fla. 2022).[3] Crawley's allegations that he "does not recall ever learning that his PII was compromised in another data breach incident, other than the Data Breach at issue here," [Am. Compl. ¶ 98], and that "in early October 2025, unknown individuals used [his] PII to apply for . . . personal loans in his name," [id. ¶ 100], are sufficient for present purposes. Cf. Webb 72 F.4th at 374 (drawing "[t]he obvious inference" that "criminals who filed [a] false tax return obtained [the plaintiff's] PII from the [at-issue] data breach" where plaintiff alleged she had "never knowingly transmitted unencrypted PII over the internet or any other unsecured source" and there was an "obvious temporal connection" between breach and false tax return).

As to Morton and O'Brien, DTiQ states only summarily that they have failed to allege traceability. See [ECF No. 24 at 8]. But, taken as true, their allegations linking the compromise

[3] To the extent that DTiQ is arguing that Crawley's traceability reasoning improperly relies on assumptions involving the conduct of third parties, see [ECF No. 24 at 8 (first citing Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc., 958 F.3d 38, 48 (1st Cir. 2020); and then citing Delaney v. Baker, 511 F. Supp. 3d 55, 68 (D. Mass. 2021))], the Court rejects that formulation because it would prevent any third-party misuse from satisfying the traceability requirement, which is plainly incompatible with Webb, see 72 F.4th at 377.

of their PII in the DTiQ breach to their respective alleged harms are sufficient for present purposes. See, e.g., [Am. Compl. ¶¶ 60–62, 66, 70–71 (O'Brien)]; [id. ¶¶ 75–77, 81–83, 88 (Morton)].

### 3. Redressability

The parties do not dispute that a favorable ruling would redress the injuries asserted by Plaintiffs.

For the foregoing reasons, Plaintiffs have established standing to seek damages.

## B. Standing to Seek Injunctive Relief

The Amended Complaint seeks injunctive relief to address DTiQ's "continued possession of [Plaintiffs'] sensitive and confidential records," [Am. Compl. ¶ 218], in the face of its "inadequate cybersecurity system and policies," [id. ¶ 217]. Plaintiffs describe the relief sought only in broad terms, requesting "injunctive relief as is necessary to protect [their] interests" and "[e]njoining [DTiQ] from further deceptive practices and making untrue statements about the [d]ata [b]reach and the stolen PII." [Id. at 37]. Such an injunction would not "protect the plaintiffs from future misuse of their PII by the individuals they allege now possess it" but rather "would safeguard only against a future breach." Webb, 72 F.4th at 378. Accordingly, Plaintiffs must plead that they are "likely to suffer future injury" that is independent of the past theft of their data. Id. (quoting Laufer v. Acheson Hotels, LLC, 50 F.4th 259, 276 (1st Cir. 2022)). DTiQ argues that the "'forward-looking' relief" sought by Plaintiffs is not supported by "any purported [future] risk." [ECF No. 24 at 10]. Plaintiffs respond that DTiQ, unlike the defendant in Webb, has made no changes to improve its cybersecurity, suggesting that their data continues to be at risk of being further compromised in the future. [ECF No. 27 at 14].

The Court agrees with DTiQ. First, Plaintiffs' assertion that DTiQ has made no changes to its cybersecurity practices is not entirely consistent with their allegation that DTiQ "changed

network passwords, and reviewed [its] policies and procedures," [Am. Compl. ¶ 38], which—depending on the hackers' method of access—might be all the response that was required. Second, Webb did not endorse a presumption that a future data breach is likely without such changes. See 72 F.4th at 378. Rather, it looked to the relationship between the "alleged injuries" asserted by Plaintiffs and "their requested injunctions." Id. Here, as in Webb, Plaintiffs have pleaded no evidence to suggest that a second breach of DTiQ's systems is imminent or likely. See id. (noting that "virtually every holder of private data" faces some "risk of future cyberhacking" and declining to treat that risk as "sufficiently imminent to justify injunctive relief"). Finally, even if Plaintiffs had pleaded a sufficiently imminent risk, the Amended Complaint does not establish how such a risk would be redressed by the broad and vaguely scoped injunctive relief that Plaintiffs ask for. See [Am. Compl. at 14]. Plaintiffs have therefore not shown standing to seek such injunctive relief.

## IV. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

The Amended Complaint asserts claims of negligence, [Am. Compl. ¶¶ 199–219]; negligence per se, [id. ¶¶ 220–232]; breach of implied contract, [id. ¶¶ 187–201];[4] unjust enrichment, [id. ¶¶ 202–206]; and invasion of privacy, [id. ¶¶ 207–219].[5]

### A. Negligence

To state a claim for negligence under Massachusetts law, a plaintiff must plead "the elements of duty, breach, causation, and damages." Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st

[4] The Court notes that the numbering in the Amended Complaint is inconsistent, but uses the paragraphs as numbered.

[5] "[T]he parties concede, at least tacitly, that Massachusetts law controls" Plaintiffs' claims, so the Court "honor[s] the reasonable understanding of the parties as to choice of law" and does not analyze potential choice-of-law issues. Katz, 672 F.3d at 72.

Cir. 2014) (citing Leavitt v. Brockton Hosp., Inc., 907 N.E.2d 213, 215 (Mass. 2009)). DTiQ raises several challenges to Plaintiffs' negligence claim.

First, DTiQ argues that Plaintiffs have failed to plead any injury or that any injury was caused by DTiQ's alleged negligence. [ECF No. 24 at 11]. The Court disagrees. The actual-misuse and risk-of-future-misuse harms discussed above are cognizable injuries under Massachusetts law, see In re LastPass Data Sec. Incident Litig., 742 F. Supp. 3d 109, 123–24 (D. Mass. 2024), and Plaintiffs have adequately pleaded that those injuries were both "cause[d] in fact" by and "within the scope of the foreseeable risk arising from" DTiQ's alleged failure to securely maintain their data, Leavitt, 907 N.E.2d at 219. Though DTiQ directs the Court to a decision in which another session of this Court held that the plaintiffs had not sufficiently alleged harm or causation following a data breach, see [ECF No. 24 at 11 (citing Harvey v. Nat'l Amusements, Inc., No. 24-cv-10027, 2025 WL 928776, at *3 (D. Mass. Mar. 27, 2025))], that court's reasoning rested on its conclusion that, unlike in this case, the plaintiffs had failed to allege any actual misuse under Webb, see Harvey, 2025 WL 928776, at *2–3. Harvey does not alter the Court's conclusion that the Amended Complaint adequately pleads an injury caused by DTiQ's alleged negligence.

Next, DTiQ argues that the injuries Plaintiffs allege cannot support recovery under the Massachusetts law of negligence because they are barred by the economic loss doctrine, see [ECF No. 24 at 12], which provides that "purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage," In re TJX Cos. Retail Sec. Breach Litig., 564 F.3d 489, 498 (1st Cir. 2009) (quoting Aldrich v. ADD Inc., 770 N.E.2d 447, 454 (Mass. 2002)). Plaintiffs do not dispute that the economic loss doctrine precludes recovery where the claimed injury is purely economic, but they argue that their

allegations of emotional distress—including "feelings of anxiety, sleep disruption, stress, fear, and frustration"—present a claim of non-economic harm that is cognizable under Massachusetts law. [ECF No. 27 at 16 (quoting [Am. Compl. ¶¶ 72, 90, 109])]. The Court agrees that Plaintiffs' allegations of emotional distress are a cognizable non-economic harm, which DTiQ does not appear to dispute, see [ECF No. 24 at 12]. That conclusion is strengthened by the fact that, as discussed below, Massachusetts law requires Plaintiffs' emotional-distress claim to be accompanied by some alleged physical manifestation. See Maio v. TD Bank, N.A., No. 22-cv-10578, 2023 WL 2465799 at *4 (D. Mass. Mar. 10, 2023) (collecting cases and concluding that "allegations of lost sleep, anxiety, and depression are sufficient to satisfy [an] exception to the economic loss doctrine" under Massachusetts law). But see Mohsen v. Veridian Credit Union, 733 F. Supp. 3d 754, 766–67 (N.D. Iowa 2024) (collecting cases and concluding that the economic loss doctrine applies under Iowa law even where plaintiffs plead emotional injuries, because to hold otherwise "would swallow the economic loss rule"). Because Plaintiffs have pleaded a non-economic harm in the form of emotional distress, the economic loss doctrine does not bar their negligence claim.

Concerning Plaintiffs' emotional-distress claims, DTiQ also argues that Plaintiffs have failed to allege the elements required to state a claim for negligent infliction of emotional distress under Massachusetts law. See [ECF No. 24 at 12]. Massachusetts law permits negligence claims premised on emotional harm where a plaintiff establishes negligence, causation, emotional distress, and two additional factors: first, that the plaintiff suffered "physical harm manifested by objective symptomatology," and second, "that a reasonable person would have suffered emotional distress under the circumstances of the case." Lanier v. President & Fellows of Harvard Coll., 191 N.E.3d 1063, 1072 (Mass. 2022) (quoting Payton v. Abbott Labs, 437

N.E.2d 171, 181 (Mass. 1982)). "[P]hysical harm is interpreted to include a broad range of symptoms," id., including those that "could be classified as more 'mental than 'physical,'" id. (quoting Gutierrez v. Mass. Bay Transp. Auth., 772 N.E.2d 552, 566 (Mass. 2002)), but in all instances it must be accompanied by "'objective evidence' to 'corroborate [plaintiffs'] . . . claims,'" id. (alteration in original) (quoting Sullivan v. Bos. Gas Co., 605 N.E.2d 805, 810 (Mass. 1993)). Massachusetts courts treat a broad range of harms as sufficient under this test. See Gutierrez, 772 N.E.2d at 566 (collecting cases involving stomach pain, headaches, nausea, sleeplessness, crying spells, nightmares, concentration problems, reading problems, depression, and anxiety).

At this stage of the litigation, the Court is satisfied that Plaintiffs' allegations of anxiety and sleep disruption are sufficient to make out a claim for negligent infliction of emotional distress, since those symptoms have been previously recognized by Massachusetts courts. The parties have not squarely addressed whether the other purported symptoms asserted by Plaintiffs have any precedent under Massachusetts law, and in the absence of briefing on that point, the Court need not conclusively approve or reject them as additional possible bases for recovery. As for the reasonableness and foreseeability of Plaintiffs' reactions, that issue is generally left to the factfinder, and Plaintiffs have carried their burden at this stage. See Lanier, 191 N.E.3d at 1074. Accordingly, Plaintiffs have stated a negligence claim under Massachusetts law.

**B. Negligence Per Se**

The Amended Complaint includes a claim for negligence per se based on a violation of 15 U.S.C. § 45. See [Am. Compl. ¶ 222]. As DTiQ notes, however, Massachusetts does not recognize negligence per se as an independently sufficient route to establish breach of duty. See [ECF No. 24 at 13 (first citing Juliano v. Simpson, 962 N.E.2d 175, 179 (Mass. 2012); and then citing Doe v. Tenet Healthcare Corp., 731 F. Supp. 3d 142, 149 (D. Mass. 2024))]. Plaintiffs

appear to concede that this claim is not available under Massachusetts law, and suggest instead that the Court "incorporat[e]" their negligence per se arguments into their standard "negligence claim" by permitting the statute to "inform[] the standard of care." [ECF No. 27 at 17]. Massachusetts law permits Plaintiffs to offer "violation of a statute . . . [as] 'some evidence' of the defendant's negligence," Bennett v. Eagle Brook Country Store, Inc., 557 N.E.2d 1166, 1168 (Mass. 1990) (quoting Cimino v. Milford Keg, Inc., 431 N.E.2d 920, 923 (Mass. 1982)); accord Juliano, 962 N.E.2d at 180, so the Court will permit Plaintiffs to raise that argument at subsequent stages of this case, but Plaintiffs' separate claim for negligence per se must be dismissed.

### C. Breach of Implied Contract

Plaintiffs do not assert that DTiQ breached an express written or oral contract but rather argue that the Court should find an implied contract that required DTiQ to safeguard their PII and promptly disclose unauthorized access. [Am. Compl. ¶¶ 187–201]. Massachusetts law recognizes two kinds of implied contract. See In re Shields Health Care Grp., Inc. Data Breach Litig., 721 F. Supp. 3d 152, 163 (D. Mass. 2024); see generally 1 Williston on Contracts §§ 1:5, 1:6 (4th ed. May 2026 update). An implied-in-fact contract is a contract where the parties' mutual assent is inferred from context. In re Shields, 721 F. Supp. 3d at 163. A quasi contract (sometimes called a contract implied in law), by contrast, is not a contract at all, see 1 Williston § 1:6; Salamon v. Terra, 477 N.E.2d 1029, 1031 (Mass. 1985), but rather an obligation created by the Court "for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent," In re Shields, 721 F. Supp. 3d at 163 (quoting Salamon, 477 N.E.2d at 1031), on the basis that a party's "reasonable expectations" were "defeated" by a counterparty's conduct, id. (quoting Liss v. Studeny, 879 N.E.2d 676, 682–83 (Mass. 2008)).

Plaintiffs have not stated a claim for a contract implied in fact. The Amended Complaint states that DTiQ offered employment on the condition that potential employees "provided [DTiQ] with their PII," [Am. Compl. ¶ 188], and that DTiQ "promised to safeguard employees' PII," [id. ¶ 189], but it does not plead any facts concerning when or in what form DTiQ made these representations or any other facts about the parties' ongoing relationship that would suggest that DTiQ agreed to protect employees' PII. At most, Plaintiffs direct the Court to a website containing DTiQ's privacy policy, which was last updated in June 2023, see [id. ¶ 25 n.4], but that public-facing policy—at least in its present iteration—expressly states that it applies only to users of DTiQ's website and services, "not . . . to information collected . . . or provided in connection with an application for employment, ongoing employment, or former employment," Privacy Policy, DTiQ, https://www.dtiq.com/privacy-policy. Unlike cases from other jurisdictions in which implied-in-fact contracts were found on the strength of particular representations made by the defendant, Plaintiffs here have not "allege[d] conduct and a course of dealing that raise a strong inference" that the parties mutually assented to an agreement that required DTiQ to provide a certain standard of protection for Plaintiffs' data. Sackin v. TransPerfect Glob., Inc., 278 F. Supp. 3d 739, 750 (S.D.N.Y. 2017) (relying on specific promises in privacy policies and security practices manual).

Neither of the cases cited by Plaintiffs alters this conclusion. Plaintiffs first direct the Court to In re Shields, but in that case, another session of this Court rejected an implied-in-fact contract theory because those plaintiffs, like Plaintiffs here, had not "allege[d] sufficient facts to permit an inference that the parties reciprocally agreed to enter into an agreement," 721 F. Supp. 3d at 163. (The In re Shields court did recognize a quasi contract, see id., which the Court addresses below.) Plaintiffs also direct the Court to Springer v. Johnson & Wales University,

No. 24-cv-00399, 2025 WL 1261086 (D.R.I. Apr. 30, 2025), see [ECF No. 27 at 18], which does make reference to an agreement implied in fact, see Springer, 2025 WL 1261086 at *5. The Springer court, however, expressly noted the absence of any "document or conversation showing that [the defendant] made any promises or agreements," and its recognition of an implied contract rested on the reasonableness of the plaintiffs' expectation "that [an] employer or university would accept [employees' or students'] PII with the promise that it would keep it safe." Id. Terminology aside, Springer's analysis ultimately favors recognition of a quasi contract, not a contract implied in fact. Accordingly, neither case disrupts the Court's conclusion that Plaintiffs have failed to state a claim for a contract implied in fact.

To the extent that Plaintiffs' expectation that their information would be safeguarded supports a quasi-contract claim, as opposed to a claim of a contract implied in fact, that quasi-contract argument is properly analyzed under Plaintiffs' unjust-enrichment cause of action, rather than as a standalone cause of action. The line of cases following Salamon affirms that Massachusetts courts treat quasi contract as coextensive with unjust enrichment, holding that quasi contract provides the legal basis for the remedy of restitution following a party's unjust enrichment. See Salamon, 477 N.E.2d at 1039 ("The underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party."); Liss, 879 N.E.2d at 682 (explaining that quantum meruit "is an obligation that arises under quasi contract theory"); Metro. Life Ins. Co. v. Cotter, 984 N.E.2d 835, 850 (Mass. 2013) (conflating unjust-enrichment and quasi-contract analysis); Lanier, 191 N.E.3d at 1090 (Budd, C.J., concurring) ("In [Massachusetts], we have typically used unjust enrichment for quasi contractual matters or to undo property transfers tainted by fraud, bad faith, or violation of a duty . . . ."); Tody's Serv., Inc. v. Liberty Mut. Ins. Co., 260 N.E.3d 309, 312 n.3 (Mass. 2025)

(noting that to the extent the plaintiff "asserted a contract implied in law, our . . . analysis of the [plaintiff's] unjust enrichment claim is dispositive"); see also 1 Corbin on Contracts § 1.20 (2026) (explaining that the appropriate remedy for unjust enrichment is restitution, provided through "quasi-contractual rights and certain equitable rights that perform similar functions"); Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc. ("MEEI"), 552 F.3d 47, 57 (1st Cir. 2009) (citing Massachusetts precedent on quasi contract to establish standard for unjust enrichment). The Court will thus dismiss Plaintiffs' implied contract claim, while allowing the doctrine of quasi contract to inform its unjust enrichment analysis.

**D. Unjust Enrichment**

Under Massachusetts law, an unjust enrichment claim requires the "unjust enrichment of one party and unjust detriment to another party," MEEI, 552 F.3d at 57 (quoting Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 234 n.7 (1st Cir. 2005)); accord Fox v. F & J Gattozzi Corp., 672 N.E.2d 547, 552 (Mass. App. Ct. 1996), with an "emphasi[s] [on] the primacy of equitable concerns," MEEI, 552 F.3d at 57 (citing Salamon, 477 N.E.2d at 1031). A plaintiff must allege "that the defendant received a benefit" and that "such a benefit was unjust," Metro. Life Ins. Co., 984 N.E.2d at 850.

DTiQ, analogizing to the decision of the district court on remand in Webb, No. 22-cv-10797, 2023 WL 5938606 (D. Mass. Sep. 12, 2023), argues that Plaintiffs have failed to state a claim for unjust enrichment because they do not allege any benefit received by DTiQ. [ECF No. 24 at 16]. Plaintiffs point to the services they rendered as employees, [ECF No. 27 at 19], for which they would have requested higher pay if they had known that DTiQ "would not adequately protect their PII," [Am. Compl. ¶ 205]. The Court agrees that Plaintiffs have identified a benefit retained by DTiQ.

The Court must credit Plaintiffs' allegation that they held particular expectations about the security of their data and that DTiQ's systems were not as secure as Plaintiffs expected them to be. Treating those facts as true, Plaintiffs have plausibly alleged that DTiQ retained a benefit, which can be conceptualized in one of two ways: either that DTiQ should have improved its cybersecurity to be consistent with Plaintiffs' expectations, in which case it retained the difference between its actual cybersecurity costs and the costs it would have incurred by improving its systems in accordance with those expectations, or DTiQ should have advised Plaintiffs of the inadequacy of its cybersecurity during their employment negotiations, in which case it retained the difference between the actual wages paid to Plaintiffs and what it would have reasonably paid for equivalent work if prospective employees were aware of the risk to their PII inherent in working for DTiQ.

Whether DTiQ's retention of that benefit was unjust "turns on the reasonable expectations of the parties." Metro. Life Ins. Co., 984 N.E.2d at 850 (quoting Glob. Invs. Agent Corp. v. Nat'l Fire Ins. Co., 927 N.E.2d 480, 494 (Mass. App. Ct. 2010)), and whether Plaintiffs' expectation was reasonable is a fact-specific inquiry. See, e.g., id. at 851; Salamon, 477 N.E.2d at 1032. Plaintiffs allege that DTiQ "failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers . . . , and failed to maintain reasonable security safeguards or protocols . . . ." [Am. Compl. ¶ 6]. They also allege that they understood DTiQ's "collecting and maintaining" of their PII to imply a promise to "safeguard the data using reasonable means." [Id. ¶ 30]. At this stage, Plaintiffs have sufficiently alleged facts that—if proven—could lead a factfinder to conclude that they had a reasonable expectation in the security of their data and that DTiQ saved money, either on cybersecurity expenses or on Plaintiffs' wages, in a way that defeated Plaintiffs' reasonable

expectation. While Plaintiffs may face an uphill battle in persuading a factfinder, they have done enough to survive a motion to dismiss on this count.[6]

### E. Invasion of Privacy

Plaintiffs plead a common-law invasion of privacy claim. [Am. Compl. ¶¶ 207–219]. Massachusetts law provides a statutory cause of action for invasion of privacy, see Mass. Gen. Laws ch. 214, § 1B, but no common-law claim. See Transam. Ins. Co. v. KMS Patriots, L.P., 752 N.E.2d 777, 782 & n.7 (Mass. App. Ct. 2001) (citing Tower v. Hirschhorn, 492 N.E.2d 728, 732 n.4 (Mass. 1986)); Doe, 731 F. Supp. 3d at 149. In their opposition to DTiQ's motion to dismiss—but not in their Amended Complaint—Plaintiffs cite to that statute. [ECF No. 27 at 20]. In the interest of thoroughness and to forestall a request to amend the complaint again, the Court will address the viability of the relevant statutory cause of action.

The statute provides "a right against unreasonable, substantial or serious interference with . . . privacy." Mass. Gen. Laws ch. 214, § 1B. To state a claim, Plaintiffs must plead either "public disclosure of private facts" or unreasonable intrusion upon "solitude" or "seclusion." Polay v. McMahon, 10 N.E.3d 1122, 1126 (Mass. 2014). Some sessions of this Court have interpreted the statute to contain an intent requirement, see, e.g., Doe, 731 F. Supp. 3d at 151 (first citing Elliott-Lewis v. Abbott Lab'ys, 378 F. Supp. 3d 67, 71 (D. Mass. 2019); and then citing Mass. Gen. Laws ch. 258, § 10(c)); Shea v. Am. Int'l Coll., No. 24-cv-11449, 2025 WL 2577196, at *6 (D. Mass. Sep. 5, 2025), though it appears that "[n]o Massachusetts appellate

---

[6] To the extent that this conclusion is at odds with the decision of another session of this Court in Webb, 2023 WL 5938606, at *4 (concluding that plaintiffs had not pleaded sufficient facts to support that their transaction gave rise to a reasonable expectation about their data security), the Court respectfully notes that other sessions have permitted similar claims to go forward, see, e.g., Priddy v. ZOLL Med. Corp., No. 23-cv-10575, 2025 WL 975234, at *13–14 (D. Mass. Mar. 31, 2025); In re Shields, 721 F. Supp. 3d at 165; Shea v. Am. Int'l Coll., No. 24-cv-11449, 2025 WL 2577196, at *5–6 (D. Mass. Sep. 5, 2025).

court has . . . ruled on the issue," Alexander v. Clarke, No. 09-cv-05456, 2011 WL 1770819, at *4 n.13 (Mass. Super. Ct. May 3, 2011).

The Court need not resolve whether intent must be pleaded alongside the other elements of a ch. 214, § 1B claim, because here, the Amended Complaint does not suggest conduct by DTiQ that amounts to either "public disclosure" of Plaintiffs' PII or to intrusion upon Plaintiffs' privacy. See Polay, 10 N.E.3d at 1126. Plaintiffs have alleged that the data breach was "an intentional interference with Plaintiffs' . . . seclusion," [Am. Compl. ¶ 212], but they do not allege that DTiQ committed the data breach. At most, the Amended Complaint alleges that DTiQ failed to take adequate steps to prevent a third party from intruding on Plaintiffs' privacy, but failure to take adequate protective measures does not amount to "dissemination" of private material, see Dasey v. Anderson, 304 F.3d 148, 154 (1st Cir. 2002) (quoting Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 567 N.E.2d 912, 914 n.4 (Mass. 1991)), nor to any other conduct actionable under the statute, such as "public disclosure," Polay, 10 N.E.3d at 1126, or "intrusion upon a person's right to seclusion," Amato v. Dist. Att'y for Cape & Islands Dist., 952 N.E.2d 400, 409 (Mass. App. Ct. 2011). Plaintiffs have not identified any case in which a party was held liable under ch. 214, § 1B for failure to prevent a third-party attack, and, on the facts of this case, the Court declines to recognize such liability, which would expand the statute's ambit considerably. See In re Shields, 721 F. Supp. 3d at 164 (dismissing invasion-of-privacy claim because "Plaintiffs allege only that hackers disseminated their private information and intruded on their privacy," not that the defendant did so).

Neither of the state court cases offered by Plaintiffs persuades the Court otherwise. In Walker v. Boston Medical Center Corp., No. SUCV21051733BLS1, 2015 WL 9946193 (Mass. Super. Ct. Nov. 20, 2015), the defendants themselves "inadvertently made [the plaintiffs'

medical records] accessible to the public," id. at *1, which amounts to disclosure of the type conventionally within the scope of ch. 214, § 1B. In Shedd v. Sturdy Memorial Hospital, Inc., No. 2173CV00498C, 2022 WL 1102524 (Mass. Super. Ct. Apr. 5, 2022), the court did not elaborate on why it concluded that the plaintiffs had stated an invasion of privacy claim, except to note that they alleged "inadequate, negligent and/or intentionally insufficient security measures," id. at *11. Given the possibility that the defendant facilitated the disclosure through "intentionally insufficient security measures," id., and the otherwise unexplained nature of that court's decision, the Court does find any persuasive value in that citation.

In sum, the Court concludes that Plaintiffs have failed to plead any conduct by DTiQ that falls within the scope of ch. 214, § 1B as interpreted by Massachusetts courts.

## V. CONCLUSION

For the foregoing reasons, DTiQ's motion to dismiss, [ECF No. 23], is **GRANTED** as to Plaintiffs' request for equitable relief and Plaintiffs' claims of negligence per se, breach of implied contract, and invasion of privacy. The motion is otherwise **DENIED**, meaning that Plaintiffs' claims for damages under theories of negligence and unjust enrichment may proceed. All other claims are **DISMISSED**.

**SO ORDERED.**

September 21, 2026

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE